# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

CHRISTOPHER JOSEPH QUAGLIN,
United States Citizen, Pretrial Detainee
held at Northern Neck Regional Jail in
Warsaw, Virginia

      *Petitioner,*

  v.

Civil Action No. _____.

MERRICK GARLAND in his official
Capacity as United States Attorney General,
950 Pennsylvania Ave., NW Washington, D.C.
20530;
   and
TED HULL, in his official Capacity as
Superintendent of Northern Neck Regional Jail,
3908 Richmond Rd, Warsaw, VA 22572

    *Respondents,*

---

## PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. 2241
## AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Joseph D. McBride, Esq.
Bar ID:  NY0403
The McBride Law Firm, PLLC
99 Park Avenue, 6th Floor
New York, NY 10016
Telephone: (917) 757-9537
Email: jmcbride@mcbridelawnyc.com

Dated: April 26, 2022

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................4

II.     JURISDICTION...................................................................................................5

III.    VENUE................................................................................................................6

IV.     PARTIES.............................................................................................................6

V.      STATEMENT OF FACTS...................................................................................7

        **A.** PETITIONER HAS CELIAC DISEASE ……………..…………………………7

        **B.** STATUS CONFERENCE: AUGUST 5, 2021 …………..…………..…………10

        **C.** TREATMENT AT THE DC JAIL……………………………………………12

        **D.** STATUS CONFERENCE: OCTOBER 4, 2021 …………......…………………15

        **E.** THE JAIL AT USP LEWISBURG …………..…………..……………………16

        **F.** JAIL AT NORTHERN NECK REGIONAL JAIL …………..………………………17

        **G.** THE INTENSITY OF PETITIONER'S PUNISHMENT THEN INCREASED …………23

        **H.** Hull to McBride:  March 9, 2022, 3:06 PM …………..…….…………….....24

        **I.** McBride to Hull:  March 28, 2022, 2:17 PM …………………………......…26

        **J.** Hull to McBride:  March 28, 2022, 6:01 PM …………..…………………….27

        **K.** McBride to Hull:  March 28, 2022, 6:48 PM …………..…………..………28

        **L.** Hull to McBride:  March 28, 2022, 8:33 PM ……………………………….28

        **M.** McBride to Hull:  March 28, 2022, 11:15 PM …………..…………....……29

        **N.** Hull to McBride on March 29, 2022 at 7:16 AM …………………..……………29

VI.     CONDITIONS OF CONFINEMENT…………..…………………………..……29

VII.    RIGHT TO COUNSEL VIOLATIONS…………………………………….……………31

VIII.   PETITIONER HAS NEVER SEEN THE DISCOVERY IN HIS CASE……………………...……32

IX.      THE GRIEVANCE PROCESS IS IRRETRIEVABLY BROKEN ……………………...………...33

X.      LEGAL STANDARD…………………………………………………………..…………..34

XI.      CONDITIONS OF CONFINEMENT CLAIMS ARE PROPER IN HABEAS……………………35

XII.      THE DUE PROCESS RIGHTS OF PRETRIAL DETAINEES……………..................………36

XIII.     DELIBERATE INDIFFERENCE ……………………………..…………………………….38

XIV.      SOLITARY CONFINEMENT IS PUNISHMENT………………………………..……………..39

XV.      THE HUMANE ALTERNATIVES TO LONG TERM SOLITARY CONFINEMENT ACT ………41

XVI.      THE UNITED NATIONS STANDARD FOR MINIMUM RULES FOR THE TREATMENT OF

          PRISONERS: THE NELSON MANDELA RULES………………………………………………42

XVII.     PROLONGED SOLITARY CONFINEMENT IS TORTURE ………..………...………...…….43

XVIII.    THE PRISON REFORM ACT'S (PRLA) EXHAUSTION OF ADMINISTRATIVE REMEDIES

          REQUIREMENT……..………………………………………….…………………………... 44

XIX.     THE GRIEVANCE SYSTEM IS UNAVAILABLE AND UNDER THE PRLA……..………….. 46

XX.      CAUSES OF ACTION ....................................................................................................49

          FIRST CLAIM:      DELIBERATE INDIFFERENCE TO PETITIONER'S MEDICAL CONDITION
                            VIOLATES PETITIONER'S 5TH AMENDMENT RIGHTS………………49

          SECOND CLAIM:     THE ILLEGAL USE OF SOLITARY CONFINEMENT VIOLATES
                            PETITIONER'S 5TH AMENDMENT RIGHTS…………………..……..54

          THIRD CLAIM:      THE ILLEGAL USE OF PROLONGED SOLITARY CONFINEMENT
                            VIOLATES PETITIONER'S 5TH AND 8TH AMENDMENT RIGHTS………55

          FOURTH CLAIM:     INTERFERENCE WITH PETITIONER'S ACCESS TO COUNSEL AND
                            DISCOVERY VIOLATES HIS 6TH AMENDMENT RIGHTS......................58

          FIFTH CLAIM:      RETALIATION FOR SPEAKING TO THE PRESS AND MEMBERS OF
                            CONGRESS VIOLATES PETITIONER'S 1ST AMENDMENT RIGHTS…....59

XXI.      CONCLUSION …………………………………………………………………...………60

XXII.     PRAYER FOR RELIEF....................................................................................................61

# I.     INTRODUCTION

1.    Petitioner CHRISTOPHER JOSEPH QUAGLIN petitions the Court for a Writ of Habeas Corpus because he is a United States citizen, currently held at Northern Neck Regional Jail ("NNRJ"), in Warsaw, Virginia as a federal pretrial detainee and not as an inmate (contrary to the assertion of Respondent Superintendent Ted Hull,) in violation of his constitutional and human rights.

2.    Petitioner alleges that his serious underlying medical condition – celiac disease – has been treated with deliberate indifference, which has caused him to suffer irreparable harm. Petitioner has been moved to six different jails since first being detained in April of 2021, and that the malicious indifference to his medical condition intensifies after each move. Petitioner further alleges that he has been repeatedly punished and subjected to prolonged solitary confinement for punitive reasons.

3.    Petitioner alleges, that he has been forced to live, sleep, and eat in disgusting unsanitary living conditions where there is black mold, rats, and roaches. Insect and rat droppings are routinely found on his food trays, and that he has been forced to drink brown and/or black looking water.

4.    Petitioner alleges that he has been and continues to be purposefully exposed to danger by being housed in notoriously hostile parts of the jails he has been housed in.  That he was put into a section of NNRJ where violent gang and cartel members are housed. fact, assaulted so badly that he received eight stitches next to his right eye.  That he is routinely denied access to necessities such as toiletries, medicine, food, and exposure to natural light.

5.      Petitioner alleges further that he has never seen the discovery in his case despite being detained for over one year. That his attorney-client privileged calls are repeatedly spied on and monitored.  That reasonable access to his attorneys has been routinely and maliciously interrupted. And that each time Petitioner complains about his inability to meaningfully participate in his defense, additional punitive measures are taken to intimidate, silence, and harm him.

## II.      JURISDICTION

6.      Petitioner brings this action under 28 U.S.C. §§ 2241 and 2242 and invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1651, 2201, and 2202, the Fifth Amendment to the United States Constitution, the Sixth Amendment to the United States Constitution, and the Eighth Amendment to the United States Constitution. Because he also seeks declaratory relief, Petitioner also relies on Rule 57 of the Federal Rules of Civil Procedure.

7.      This Court is empowered under 28 U.S.C. §§ 2241 to grant the Writ of Habeas Corpus and to entertain the Petition filed by Christopher Joseph Quaglin. This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. §§ 2202, as this case involves an actual controversy within the Court's jurisdiction.

## III. VENUE

8.     Venue is proper in the United States District of Columbia since at least one respondent resides in the district, a substantial part of the events of omissions giving rise to the claim occurred in the district, at least one respondent may be found in the district, and all respondents are either officers or employees of the United States or any agency thereof acting in their official capacities. 28 U.S.C. §§ 1391(b); 1391(e).

## IV. PARTIES

9.     Petitioner CHRISTOPHER JOSEPH QUIGLAN is a thirty-six-year-old United States Citizen from the State of New Jersey. He was arrested pursuant to his participation in the protests and subsequent riot that occurred at the United States Capitol on January 6, 2021. He has been in the custody of the United States Government since April 7, 2021. He is charged in Case No. 21-cr-40-4 (TNM) (D.D.C.), which is scheduled for a jury trial on October 3, 2021. He is currently being detained in Northern Neck Regional Jail in Warsaw, Virginia.

10.     Respondent MERRICK GARLAND is the Attorney General of the United States. He has led the Department of Justice since March 11, 2021. Respondent Garland first sought Petitioner's pretrial detention, and his actions keep Petitioner detained today. Accordingly, Respondent Garland is ultimately responsible for Petitioner's unlawful detention and is named in his official capacity.

11.     Respondent TED HULL is the Superintendent of Northern Neck Regional Jail. Respondent Hull is charged by Respondent Garland with maintaining the custody and control of Petitioner. Accordingly, Respondent Hull is named in this action in his official capacity.

## V.    STATEMENT OF FACTS

12.    Petitioner, Christopher J. Quaglin, is an American citizen pretrial detainee that is being detained under egregious conditions that violate his constitutional and human rights.

13.    Petitioner has been in federal custody since being arrested on April 7, 2021, in New Jersey.

14.    Petitioner was ordered released by then U.S. Magistrate Judge Zahid Nisar Quraishi of the District Court for the District of New Jersey on April 7, 2021.   Chief Judge Beryl Howell of this Court reversed that order on April 16, 2021.[1]

15.    Petitioner's previous defense counsel appealed Judge Howell's April 16, 2021, decision, however, such appeal was denied by the D.C. Circuit on June 24, 2021.[2]

16.    Petitioner is currently detained in solitary confinement at Northern Neck Regional Jail (NNRJ), in Warsaw, Virginia.  NNRJ is the sixth jail that Petitioner has been housed at since being detained in April of 2021.

17.    Petitioner is thirty-six years old, grew up in New Jersey, and is an electrician by trade.

18.    He is a husband to his wife Moria, and a father to his one-year-old son, Nathan.

19.    He is supported by family, friends, and his local community.

20.    He has no criminal record or prior history of violence.

### A.    PETITIONER HAS CELIAC DISEASE.

21.    Petitioner was diagnosed with celiac disease at age 10 when he suddenly became gravely ill.  He has lived with the disease ever since.   His celiac symptoms are severe,

---

[1] *See United States v. Quaglin*, No. 21-cr-0040-TNM (Apr. 16, 2021, Detention Order at ECF Doc #: 14).

[2] *See United States v. Quaglin* D.C. Cir. No. 21-3028 at Doc.#: 1903708 (June 24, 2021).

and as such, strict adherence to food protocols prohibiting him from consuming gluten is paramount to his survival.   (*See* **Exhibit A**:  Petitioner's Celiac Positive Lab Results)

22.    Celiac disease is a chronic digestive and immune disorder that damages the small intestine.   The disease is triggered when one eats any food containing gluten. Petitioners' body's immune system attacks the absorptive lining of the gastrointestinal tract.  People with celiac disease need to follow a gluten-free diet for life.  Following a gluten-free diet can relieve celiac disease symptoms and heal damage to the small intestine. When left untreated, it causes excruciating pain, can lead to severe long-term damage, and complications that lead to death in rare cases.[3]

23.    Celiac disease symptoms include but are not limited to abdominal distension, weight loss, chronic diarrhea, abdominal cramping, bloating and gas, muscle wasting, weakness, fatigue, joint pain, osteoporosis, anemia (from impaired iron absorption), leg numbness (from nerve damage), muscle cramps (from impaired calcium absorption), aphthous ulcers (sores in the mouth from vitamin deficiency), seizures, infertility, a gluten-related skin disorder called dermatitis herpetiformis appears as small itchy blisters on the skin, and serious unfortunate behavioral changes from a weakened blood-brain barrier.[4]

---

[3] *See* National Institute of Health's Description of Celiac Disease @https://www.niddk.nih.gov/health-information/digestive-diseases/celiac-disease (last visited on April 25, 2022).

[4] *Id*. "I am allergic to wheat. When I ingest wheat my white blood cells act like wheat is a disease and the white blood cells eat my stomach and intestines from the inside causing bloating, upset stomach, diarrhea, lack of energy, internal bleeding, and with long term abuse can cause a host of other issues… this is not a lifestyle choice… I have been poisoned by the kitchen a number of times in the past 30 days."  (See EXHIBIT A page 45)

24. Celiac disease can have devastating consequences when left untreated and can even lead to death by increasing a person's risk of developing other fatal diseases.[5] The rates of gastrointestinal cancer are 40-100 times higher than those of the general population. The risk of coronary heart disease and heart failure is double that of the general population as well. The risk of death from liver disease and diseases related to malabsorption is significantly increased.[6] As is the risk of developing other autoimmune disorders, such as Type I diabetes and multiple sclerosis, and serious neurological disorders, such as epilepsy.[7]

25. The United States Government has been on notice of the fact that Petitioner has celiac disease since April 7, 2021, which is the first day that he was taken into custody.[8]

26. Petitioner has been moved around to six different locations since being taken into federal custody.

27. The locations and approximate dates are as follows:

    a. Location 1: Essex County Correctional Facility: April 2021 - September 2021;
    b. Location 2: FTC Oklahoma: September 2021- September 20, 2021;
    c. Location 3: DC Jail:  September 20, 2021- November 9, 2021;
    d. Location 4: BOP Lewisburg: November 9, 2021 - December 17, 2021;
    e. Location 5: Alexandria Detention Center: December 17, 2021 - December 20, 2021; and

---

[5] *See* " Six Ways Celiac Can Kill You", available at, https://www.celiac.com/articles.html/six-ways-celiac-disease-can-kill-you-r3145/ (last visited on April 25, 2022).
[6] See ASGE's description of celiac disease @ https://www.asge.org/home/about-asge/newsroom/media-backgrounders-detail/celiac-disease (last visited on April 25, 2022)

[7] See *Id.*

[8] *See* **EXHIBIT B:**  Christopher Quaglin's Lab Results Testing Positive for Celiac Disease

      f.   Location 6:  Northern Neck Regional Jail (NNRJ):  December 20, 2021 – Present.

28.    The outstanding part of this is that Petitioner's internal medical file travels with him from one detention center to another. Yet, the intensity and duration of his mistreatment grows worse with each transfer.

29.    For example, Petitioner has been forced to go multiple days without food each time he arrives at a new detention center because of a failure to send him with celiac-safe food or prepare celiac-safe food for his arrival, which has directly resulted in petitioner going over five days without eating on multiple occasions.

30.    Petitioner has kept and continues to keep a food, starvation, and mistreatment log since being taken into custody in April of 2021.

31.    Petitioner has been forced to spend approximately $7,500 on commissary since being detained.  He does this out of survival because that is the only way he can guarantee himself celiac-safe food.

32.    Petitioner's commissary is routinely confiscated to punish him, which causes him to starve because he is not being fed celiac-safe food.

33.    Petitioner lost approximately 28 pounds during his first few weeks at Essex County Correctional Facility.  He also vomited profusely, had chronic diarrhea, and broke out in blisters all over his body during his time at Essex County Correctional Facility.

**B.  STATUS CONFERENCE: AUGUST 5, 2021**

34.    Attorney Joseph D. McBride first appeared in Petitioner's case on August 5, 2021.  At that appearance, the Government asked DC District Court Judge Trevor McFadden to transport Mr. Quaglin from Essex County Correctional Facility to DC Jail.

35.     In arguing against his transfer, McBride cited the fact Petitioner had previously lost 28 pounds in a matter of weeks after being detained at Essex County Correctional Facility because he was negligently fed the wrong food and that Petitioner was still recovering from that unfortunate experience.

36.     McBride made a record about Petitioner's medical need for celiac-safe food going forward.  He also voiced concerns over the Petitioner's wellbeing and the risk of Petitioner having to suffer again during both the transportation process and at DC Jail.

37.     McBride informed the Court that he had previously filed an Emergency Request with the ACLU and Amnesty International for an Investigation into the Mistreatment of Prisoners at DC Jail, which cited a concerning trend involving the denial of medical care to January 6th detainees being held at DC Jail.[9]

38.     McBride's argument against Petitioner's transfer was rejected by the Court. Petitioner was marked for medical attention prior to being moved from Essex County.  On August 30, 2021, an ORDER granting the Government's Motion to Lift Order Delaying Transport was signed by DC District Judge Trevor N. McFadden. (ECF No. 122)

39.     Petitioner transferred to FTC Oklahoma in early September of 2021 and arrived at DC Jail on approximately September 20, 2021.

---

[9] *See* EMERGENCY REQUEST TO INVESTIGATE MISTREATMENT OF PRE-TRIAL DETAINEES, available at,
 https://drive.google.com/file/d/1PvbqOeSCNiKUowhCo4xvlJHvKLVHi56n/view (last visited April 25, 2022).

C.   TREATMENT AT THE DC JAIL.

40.   As highlighted above, among Petitioners various transfers, Petitioner was detained at DC Jail from approximately September 20, 2021, to November 9, 2021.

41.   Petitioner filed dozens of food-related grievances during that time.[10]

42.   Petitioner's grievances were not honored and were routinely thrown into the trash.

43.   Petitioner's grievances were either intentionally not escalated or escalated and then denied for unjustifiable reasons, such as writing outside the lines or checking the wrong box.

44.   The Jail purposefully ignored, disposed of, failed to escalate, or marked complete Petitioner's grievances to prevent him from being able to exhaust administrative remedies.

45.   The following chain of grievances is one of many examples of the Jail's disregard for Petitioner's serious preexisting medical condition:

> **(1) Inmate Formal Grievance Form from SEPTEMBER 25, 2021:**
>
> > "I have Celiac Disease, Diet is STILL NOT CORRECT.  Please explain to kitchen.  I have only had 2 proper trays (meals) since I've been here.  This is my Second IRC about this issue.  I have not ate correctly all week.  All days (have been) documented.  I (have) tried to explain what consists of the diet and they will not listen. I am very hungry. Please help."[11]
>
> **(2) Petitioner's Escalated Inmate Formal Grievance Form from SEPTEMBER 27, 2021:**

---

[10] *See* **Exhibit A**:  Christopher Quaglin's Grievances.

[11] *See Id.*

12

"I have Celiac Disease.  I told the PA upon arrival.
Since then I have had (17) trays that were not correct.
I have talked with Health Care (3) times about the
ongoing issue.  Since then I have gone 48 hours
without any food besides apples.  Every meal it is a
fight to get my tray fixed.  This is an ongoing issue
that must be fixed!  <u>Please help!</u>"[12]

### (3) Petitioner's Inmate Formal Grievance Form from October 1, 2021:

"I have Celiac Disease.  I have had this since 1999.
I cannot eat wheat.  Your facility does not / cannot /
chooses not to understand this.  I have asked multiple
times to talk to the nutritionist.  All have been denied.
I have had multiple issues with (the) staff's lack of
knowledge about diets.  I have had (4) meals come to
my cell that (did -=not) need to be sent back due to
wheat being in the trays…I am not receiving the
proper veg/fruits/calories…"

### (4) Petitioner's Inmate Formal Grievance Form from October 3, 2021

"Not Receiving the proper calories.  Have not had
equal calories compared to other "normal" trays…'

### (5) Petitioner's Inmate Formal Grievance Form from October 6, 2021

"Allergic to wheat.  I have had a constant battle with
the kitchen to get them to understand the gluten free
diet.  The nutritionist has refused to meet with me.  I
got a note saying they understand my diet.
HOWEVER
10/3   Got sausage patty (has wheat as a binding
agent)
10/4   Given Golden Grahms (has what in it)
10/5   Given Mystery Cereal (was told its gluten
free but I do not trust them)
10/6.   Given pasta for lunch (gluten)

PLEASE HELP"[13]

---

[12] *Id.*

[13] See *Id.*

46.　At one point, the Jail informed Petitioner that it was making a dietary accommodation for him in the form of celiac-safe corn-based oatmeal, but Petitioner began to experience abdominal pain and bleeding through his rectum after a few days of consumption.

47.　Petitioner then inadvertently discovered that Jail had lied to him, and that the corn-based oatmeal was Cream of Wheat, which is non-celiac safe, and was why he was bleeding out of his rectum.

48.　The Jail had been removing the Cream of Wheat label from the container every day, but on one day, forgot to remove the label.  Petitioner attempted to keep a container with the label removed and with the label on as proof, but the Jail confiscated them both.

49.　 Petitioner was forced to speak up three times per day because of the food situation in DC Jail.  He often did so while in great amounts of pain.  The guards interpreted his wincing as him being a whining complaining troublemaker and routinely punished him for it.

50.　The jail repeatedly took punitive retaliatory actions against Petitioner for speaking up about his need for celiac-safe food, such as intentionally reducing his caloric intake, revoking his commissary (which contained celiac safe food), and sending him to solitary confinement.

51.　The cycle of Petitioner complaining, and the Jail retaliating continued until the moment Petitioner was transferred from DC Jail.

**D. STATUS CONFERENCE: OCTOBER 4, 2021**

52. Attorney Steven Metcalf, co-counsel for Mr. Quaglin in his criminal case, raised the ongoing food issue during Petitioner's October 4, 2021, Status Conference.

53. On October 13, 2021, Judge Royce C. Lamberth found "that the Warden of the DC Jail Wanda Patten and Director of the D.C. Department of Corrections, Quincy Booth "**are in civil contempt of court.**" *See U.S. v. Worrell*, Order dated 10/13/21 at ECF Doc. #: 106) (emphasis added).

54. The jail responded by immediately retaliating against January Sixth Detainees when officers stormed into Central Treatment Facility's (CTF) C2B, removed the WiFi tower and locked the pod down, and by doing so cut off electronic communication to counsel and the outside world.

55. When the US Marshals arrived to inspect DC Jail's Central Detention Facility (CTF), the Detainees were purposefully sent to the Central Detention Facility (CDF) side of DC Jail to give the Warden time to cover up the horrific CTF conditions.

56. While the Marshals inspected CDF, the Warden sent in maintenance workers and janitors who frantically scrubbed rust, painted walls, and bleached the floors. The Warden swapped out every single piece of linen in CTF and gave the detainees new clothing. None of this was done out of concern for any detainee. All of this was done to cover-up the disgusting conditions at CTF. CDF failed inspection while CTF passed.

57. On Thursday, November 4, 2021, U.S. Representatives Marjorie Taylor Greene (GA-14) and Louie Gohmert (TX-01) were granted access to DC Jail after months of being denied access. Representatives Greene and Gohmert visited CTF's C2B, known as the "Patriot Pod" where January Sixth Detainees are held.

58.    Congresswoman Greene spoke to Petitioner about his condition.  Greene later publicly

spoke out against DC Jail's mishandling of Petitioner's medical treatment and tweeted

a photo of several prisoners in orange jumpsuits with their faces blurred out.[14]

59.    Petitioner was quickly identified as the detainee who is front and center on the tweeted

photo and was quickly retaliated against when on November 9, 2021, at approximately

4:30 AM, in an intimidating show of force when 20 guards stormed Petitioner in his

cell.  He was taken to a cell in the basement of the jail, stripped naked without

explanation, and told to put on a see-through plastic jumpsuit.

60.     Petitioner was left shivering in the cell and then removed to a cold bus.  He was not

told why he was leaving or where he was going. Neither counsel nor family knew

where he was taken for several days.  Terrorists held in GITMO have been treated

better.

## E.  THE JAIL AT USP LEWISBURG

61.    Petitioner was illegally transferred to USP Lewisburg. Upon arriving the guards and

inmates knew his name and his son Nathan's name.  Petitioner's move to Lewisburg

was designed to intimidate him into being silent and to remove him from being

reinterviewed by Rep. Greene.

---

[14]*See* https://www.newsweek.com/marjorie-taylor-greene-calls-dc-jail-section-holding-jan-6-rioters-patriot-wing-1646323

62.     On December 7, 2021, multiple members of Congress, including Rep. Marjorie Taylor Greene, Rep. Matt Gaetz, Rep. Louie Gohmert, and Rep. Paul Gosar issued a scathing report condemning DC Jail's CTF and the treatment of January Sixers.[15]

63.     The report called "UNUSUALLY CRUEL: AN EYEWITNESS REPORT FROM INSIDE THE DC JAIL," found that among other things, January 6th Detainees were treated more harshly than the inmates at the DC Jail, despite never being convicted of any crime.

64.     On December 17, 2021, Attorney Steven Metcalf made a record in court during Petitioner's status hearing. Metcalf addressed the fact that Petitioner was sent to Lewisburg, Petitioner's lack of access to discovery, and Petitioner's ongoing celiac related suffering.

65.     Petitioner briefly passed through Alexandria Detention Center before being transferred to NNRJ on December 20, 2021.

**F.   JAIL AT NORTHERN NECK REGIONAL JAIL**

66.     Petitioner was targeted for abuse and torture the moment he arrived at NNRJ on December 20, 2021, which started when NNRJ purposefully put Petitioner in a pod with COVID-19 positive prisoners.  Petitioner contracted the coronavirus as a result.

67.     Attorney Joseph D. McBride contacted NNRJ because Petitioner's health was rapidly declining and demanded answers from the jail.

---

[15] *See* Office of Rep. Marjorie Taylor Greene's Report—Unusually Cruel: An Eyewitness Account From Inside the DC Jail, available at, https://greene.house.gov/unusually-cruel (last visited on April 25, 2022).

17

68. On December 28, 2021, NNRJ Superintendent Ted Hull Responded to McBride with an objectively disturbing email that failed to answer McBride's questions or address his demands.[16]

69. On December 30, 2021, Attorney McBride sent Hull a notice that stated the following:

> Mr. Hull,
>
> Our position is that Northern Neck Regional Jail has broken its duty of care regarding Mr. Quaglin's wellbeing.
>
> My duty to my client is paramount.
>
> I make no apologies for my legally justifiable demands.
>
> **<u>YOU ARE HEREBY ON NOTICE THAT:</u>**
>
> **(1)** Mr. Quaglin has celiac disease, and you are giving him food that seriously harms him, and can potentially kill him.
>
>> We believe that your actions are deliberate, punitive, and designed to punish him.
>>
>> We remind you that Mr. Quaglin is a pretrial detainee, not an inmate, as such it is illegal to punish him.
>
> **(2)** Mr. Quaglin is literally starving. He has lost 12 pounds in less than 10 days while under your supervision and care.
>
>> If he dies, or is permanently damaged, the responsibility for who is to blame is going to land directly on you.
>>
>> We believe that your actions are deliberate, punitive, and designed to punish him.
>>
>> We remind you that Mr. Quaglin is a pretrial detainee, not an inmate, as such it is illegal to punish him.
>
> **(3)** Mr. Quaglin was recently informed by your staff that he tested Positive for COVID-19 after your facility either knowingly or

---

[16] *See* **Exhibit C**: December 30, 2021: NOTICE OF VIOLATION REGARDING A DETAINEE'S RIGHTS

negligently exposed him to COVID positive guards and inmates in J Pod.

He has since requested hospitalization due to his underlying medical condition and COVID related symptoms.

His requests have been repeatedly denied.

We believe that your actions are deliberate, punitive, and designed to punish him.

We remind you that Mr. Quaglin is a pretrial detainee, not an inmate, as such it is illegal to punish him.

**(4)** Your guards eavesdropped on an attorney client privileged call, and then suspended Mr. Quaglin's phone privileges.

Your facility denied me the right to have video visitations with my client as well.   Attached to this email is proof of said denial.

We believe that your actions are deliberate, punitive, and designed to punish him.

We remind you that Mr. Quaglin is a pretrial detainee, not an inmate, as such it is illegal to prevent him access to his lawyers.  It is also illegal to prevent him access to his discovery.

## **WE HEREBY DEMAND THE FOLLOWING ACTION:**

**(1)**  We DEMAND that you take Mr. Quaglin to the hospital for emergency medical care.

**(2)** We DEMAND that you grant him reasonable access to his attorneys.

**(3)** We DEMAND that you serve him celiac safe food.

**(4)** We DEMAND that you CEASE and DESIST all punitive action and punishment at once.

**(5)** We DEMAND that you remove Mr. Quaglin from Solitary Confinement as soon as he is COVID negative.

**WE HEREBY GIVE ADDITIONAL NOTICE:**

We will take immediate legal action unless our demands regarding Mr. Quaglin's wellbeing are met in a timely manner.

70.    On December 30, 2021, Superintendent Hull responded with the following email:

Mr. McBride,

I am aware of your client's needs, they are being addressed, so MY POSITIONS is THAT NO trust has been broken. The apparent re-iteration ad-nauseum of non-factual assertion is rather pointless….much like your demands.

Allow me to be clear, while this subject is obviously important to you and though you lack a certain level professional detachment……………to us he is just another inmate and he will receive exactly what every other inmate receives. Which is exactly what he is supposed to…..nothing more, nothing less. Regardless of the exaggerations of a New York lawyer or a inappropriately engaged Georgia congresswoman….. there is NOTHING that warrants this type of incessant hysterics attached to or about this inmate. You KNOW absolutely NOTHING about the conditions of confinement your client is in, the medical treatment and processes provided so far nor the dietary accommodations afforded. I do. I will be happy to stand by them.

You are like a blind mind standing next to a barbeque screaming about a forest fire……….. convinced it is the end of the world when actually it's just supper time.

If you want to "take legal action" ……then take it. Politeness and professional courtesy preclude me from telling you how I feel about your "demands" and your obvious lack of manners………..however my oh so subtle disregard for both might provide you a clue on to how I feel about them. You will do well to understand that "please" is a much more useful word. Without it, I afraid it is going to be tough sledding for you.

Does this manner of seeking assistance work in New York? Does this really work for you? I can tell you that threats are not a very effective strategy in Virginia or perhaps just with me, but then again that's just me.

In anticipation of the NEXT complaint I am sure you are going to harp on…..just know that compliance of direction and rules in this

jail is non-negotiable. As such your client WILL comply with that direction and you would be doing him a service to educate him on that point. You and him will find me extremely inflexible in that regard. The burden of incarceration is his to carry.

71. On December 31, 2021, Attorney McBride sent Ronald Jett, the Vice-Chairman of the NNRJ Board, a "NOTICE OF VIOLATION REGARDING A DETAINEE'S RIGHTS."[17]

72. The NOTICE informed that NNRJ's Superintendent broke its duty of care toward Petitioner and attached the abovementioned email exchange between McBride and Hull.[18]

73. McBride's NOTICE, and in particular Hull's responses to McBride's demands sparked considerable public outrage. Three days later, on January 3, 2022, fourteen members of Congress sent a letter to Michael Carvajal, the director of the Federal Bureau of Prisons, demanding that Carvajal immediately investigate the situation,[19] which reads in pertinent part, as follows:

> Many instances of physical and psychological abuse, denial of medical care, 24-hour solitary confinement, denial of basic personal hygiene, denial of access to legal counsel, destruction of records and general abuse of rights and mandated standards for prisoners have been brought to our attention. Constitutionalist Republicans in Congress will not stand idly by and allow these atrocities to continue. We promise you, good Sir, those responsible within BOP will be held to account. Despite the collaborative effort of some members of Congress and the Executive branch to suppress facts and interfere with our individual investigations, we have, collectively, already harvested a tremendous amount of condemning evidence of abuse and persecution within BOP. Thus, we are

---

[17] Id.

[18] Id.

[19]
https://clayhiggins.house.gov/sites/clayhiggins.house.gov/files/Ltr%20to%20Bureau%20of%20Prisons%201-3-22.pdf

somberly prayerful that you will recognize the significance of this official letter, and act to correct the grievances that you must, by any reasonable man's assessment, be knowledgeable of. Failure to act within the parameters of your authority will be interpreted as your personal complicity with the ongoing abuse of American citizens incarcerated within BOP facilities.

These instances of violations of your legal responsibility to protect the incarcerated population under your care include an accusation of gradual, continuous poisoning... a documented accusation of longstanding torture... where one prisoner has been forced to ingest foods that cause him incredible internal pain, slowly killing him. The gluten-free diet parameters that have been prescribed by his physician to alleviate a medically diagnosed condition, celiac disease, has been repeatedly denied by BOP wardens under your command. To protect the privacy rights of this particular pre-trial detainee, we have attached a confidential file with this letter. We expect action from your office to provide immediate medical care for the referenced American citizen. If he dies from the poisoning you are allowing, you will face criminal referral before the sun sets on his grave...

Respectfully, as members of Congress united to stand for the rights of all Americans, we are...

(Signed by the following fourteen Members of Congress)

| | |
|---|---|
| Clay Higgins | Marjorie Taylor Greene |
| Jeff Duncan | Jody Hice |
| Andy Biggs | Andrew Clyde |
| Mary E. Miller | Byron Donalds |
| Ralph Norman | Andy Harris M.D. |
| Lauren Bobert | Randy Weber |
| Paul Gosar, D.D.S. | Scott Perry |

74.    The story was national news within hours.

75.    Director Carvajal submitted his resignation 24 hours later.

76.    NNRJ has increased the intensity of Petitioner's punishment since that time.

## G.    THE INTENSITY OF PETITIONER'S PUNISHMENT THEN INCREASED

77.    NNRJ purposefully feeds Petitioner non-celiac-safe food daily to make him suffer.

78.    Petitioner regularly bleeds from his rectum, is in exorbitant amounts of abdominal pain, is malnourished, has blisters on his body, and is in a dangerously weakened state.

79. NNRJ has purposefully reduced Petitioner's caloric intake which is causing him to starve. Starvation is evidenced by the fact that Petitioner he has lost over 30 pounds of body weight since arriving at NNRJ.

80. Petitioner is gravely sick and is at serious risk of permanently damaging his vital organs.

81. His risk of developing other serious diseases that can lead to death has dramatically increased because his celiac is not being properly treated.

82. Petitioner's medical condition is regularly being used to punish him.

83. Petitioner is severely punished when he speaks out against his unjust treatment.

84. Punishment includes, but is not limited to Petitioner:

   a.    Having his commissary food confiscated;
   b.    Being falsely charged with and convicted of disciplinary violations;
   c.    Being sentenced to dangerously long periods of solitary confinement;
   d.    Denial of medical care;
   e.    Confiscation of medicine;
   f.    Confiscation of medical paperwork;
   g.    Confiscation of legal paperwork;
   h.    Prohibition against legal calls;
   i.    Prohibition against legal video calls;
   j.    Denial of discovery;
   k.    Targeted harassment by guards;
   l.    Purposefully being housed in the most dangerous section of the jail; and
   m.    Being viciously beaten by a well-known gang member and then blamed.

23

85. None of this is related to any legitimate penal interest.  All of this is designed to intimidate, punish, and cause physical and psychological pain.

86. On March 5, 2022, Petitioner received eight stitches next to his right eye after being beaten by a member of a notorious international street gang and then sentenced to 45 days in solitary confinement for his "participation" in the altercation.

87. Attorney McBride contacted NNRJ as soon as he discovered that Petitioner had been assaulted.  McBride also scheduled a video conference that Mr. Quaglin did not show up for.  This caused McBride great concern, so he called NNRJ and left a voicemail for Superintendent Hull, which set off the following email exchange between the two.[20]

## H.   Hull to McBride:  March 9, 2022, 3:06 PM

88.   On March 9, 2022, Hull wrote the following email:

> Mr. McBride,
>
> I am in receipt of your voicemail reference your concerns associated with the conditions of confinement of your client, Inmate Quaglin, Christopher. I appreciate the tone and manner of your voice mail and how you are seeking to address your concerns. I will attempt to help you with them.
>
> As you have multiple concerns, I will address the sequentially:
>
> 1.   Yes . . .  by my direction all calls, requests, inquiries or other communication about or associated with Inmate Quaglin, are being forwarded to me. This is the result of our unfortunate initital interaction and disagreement. Additionally, in order to mitigate misunderstanding, misinterpretation or misrepresentation; all communication regardless of mode or methology of inititiation will be responded to in writing.
>
> 2.   Your concerns about the provision of your client's special

---

[20] See **EXHIBIT D:** McBride-Hull March 2022 Email Exchange

diet is unfounded. Documentation reflects that your information is inaccurate. While there is evidence to suggest that your client is less than compliant with his dietary requirements he is none the less being provided a menu that is consistent with his medical condition. What is true, however, is that on one occasion he was provided a standard lunch serving when he recently went to court (my transportation staff, by oversight, neglected to tell the food service department that one of the court lunches was a special diet). The incidental mistake was identified and the necessary annotations were noted to prevent it from happening again.

3.  Your client did, in fact, incur injuries associated with an altercation with another inmate that initial evidence suggests Inmate Quaglin instigated if not initiated. Documentation indicates that he has received immediate medical treatment associated with the incident. Subsequently, he has been examined by the jail physician as follow up to his initial treatment. Documentation also indicates that he is being offered prescribed medication and that he is generally medication non-compliant. Though he has been provided medication as part of the K.O.P. (Keep on Person Medication Program) it is difficult to assess if he is compliant with those directions.

4.  Finally, your missed video visit. You scheduled an attorney visit at 9:02pm last night for today. However, the visitation "docket" for today had already been printed prior to your scheduling event and as such your visit was not included.

    I apologize for our error and will seek ways to prevent it from happening again.

    I believe that addresses you concerns. It is important for you and all interested parties to understand that while you and perhaps your client assigns a certain level of signficance to his status as a "J6 defendant". . . we do not.  His conditions of confinement have been and are strictly predicated on his behavior and the exhibition of positive institutional adjustment. Something he has to date. . . generally failed to do."

25

89. On March 15, 2022, Attorney McBride was finally able to see Petitioner and examine his well-being via a Securus Video conference, during which, Petitioner looked to be in a high degree of medical-related distress.  McBride recorded the conversation and sent it to members of Congress and the Media as evidence of Petitioner's continued torture at the hands of Ted Hull and the Department of Justice.[21]

90. On March 28, 2022, Superintendent Hull informed Attorney McBride that he was banned from using video calls going forward.  This set off a final email exchange which reads as follows:

I.    **McBride to Hull:  March 28, 2022, 2:17 PM**

91.    On March 28, 2021, Superintendent Hull informed Attorney McBride that he was banned from using video calls going forward.  This set off a final email exchange, where McBride wrote as follows:

> Mr. Hull,
>
> There are several issues that require your immediate attention.
>
> (1)    Your facility appears to have blocked my ability to schedule video conferences with Mr. Quaglin.  This is evidenced by the fact that my last session was rejected (see attached picture for proof).  As you are aware, Mr. Quaglin has a constitutional right to participate in his defense, and because of the pandemic, the ability to video conference is paramount.  Please restore our ability to video conference immediately.
>
> (2)    I need Mr. Quaglin's full medical file.  I have asked for it on the phone, sent emails to the relevant staff, and have not received it.  Mr. Quaglin signed all the relevant HIPPA waivers months ago.  I need the file to be sent to me immediately.

---

[21] See **EXHIBIT E** March 22, 2022, Video Clip of Christopher Quaglin at NNRJ

(3)     Mr. Quaglin has not been able to view his discovery which was dropped off to him months ago.  As you are aware, Mr. Quaglin has a constitutional right to participate in his defense, and because of the pandemic, the ability to video conference is paramount.  Please give him his discovery, immediately.

(4)     Mr. Quaglin has not been issued a tablet or laptop which would enable him to use the newly provided databases that have been made available to all January 6th detainees. As you are aware, Mr. Quaglin has a constitutional right to participate in his defense.  Please see to it that he is given the means to access the relevant databases, immediately.

(5)     Mr. Quaglin is a pretrial detainee, he is not an inmate, please stop calling him one and more importantly treating him like one.  As you are aware, detainees, unlike inmates, cannot be punished.  Please, therefore, release him from solitary confinement immediately.

(6)     Mr. Quaglin has not been fed a celiac safe diet.  He is in constant medical distress as a result.  Your facility needs to feed him the correct food, every meal, without exception.  Please see to it that this is accomplished, immediately.

### J.  Hull to McBride:  March 28, 2022, 6:01 PM

92.     Hull's response was as follows:

Mr. McBride,

I am at a conference so my response will be brief and my full response will have to wait until I return..

Quickly, Inmate Quaglin (yes he is an inmate and that does not necessarily connote pre or post trial) is receiving everything he is required to receive.

You can have a copy of his medical record but either you or him will have to pay for it.

You have abused the tele video privileges.  You will have to use the phones.

I will check on discovery.

I will respond further when I return.

**K.**     **McBride to Hull:  March 28, 2022, 6:48 PM**

93. McBride's response was as follows:

Mr. Hull,

In terms of importance, Mr. Quaglin's enumerated constitutional rights trump whatever conference it is that you are attending.

Under no circumstances did I abuse any privileges.

I will pay for the records.

For the 100th time, Mr. Quaglin is a DETAINEE, and you are NOT to treat him like an inmate.

Inmates are allowed to be punished within the bounds of the law, whereas detainees are NOT allowed to be punished.

Mr. Quaglin is 30 lbs underweight and still has stitches next to his eye from the vicious assault that took place in NNRJ.

Restore my ability to see my client at once.

Deny me the ability to see my client's face on video, and I promise you, I will sue you for violating Mr. Quaglin's civil rights."

**L.**     **Hull to McBride:  March 28, 2022, 8:33 PM**

94.     Hull then emailed the following:

Then sue me. INMATE Quaglin is receiving everything he is supposed to and he is being treated consistent with his behavior and the specific requirements of his situation. You WILL wait until I return to the facility. There is NOTHING about this that requires this level of urgency or my immediate involvement into your ludicrous monotonous complaints.

You HAVE abused the video visitation system and it is a privilege not a right.......take Inmate Quaglin's call or drive here and visit with Inmate Quaglin.

Though you lack the ability to intimidate me but you somehow think you can leverage me, I am confident that this will end up on the internet do me a favor and at least include the whole email.

My staff will calculate the cost associated with copying IF Inmate Quaglin has approved it. We will advise.

This conversation is over. I will address the discovery issue when I return at the end of the week and I will advise.

**M.**      **McBride to Hull:  March 28, 2022, 11:15 PM**

95. In further response, McBride wrote back on March 28, 2022 at 11:15 PM, "I look

forward to deposing you, and cross-examining you."

**N.**      **Hull wrote back to McBride on March 29, 2022 at 7:16 AM**

96. "So do I".

97. Ted Hull has not followed up with Attorney McBride as of the day of this writing.

98. Most importantly, Petitioner remains in solitary confinement as of the day of this writing

99. Ted Hull has not followed up with Attorney McBride as of the day of this writing.

100.      Most importantly, Petitioner remains in solitary confinement as of the day of this

writing.

**VI.      CONDITIONS OF CONFINEMENT**

101.      As mentioned above, Petitioner has been to six different jails and has spent most of

his time at each prison in solitary confinement.  Petitioner is routinely cut off from

communication with his family and his attorney.  Consequentially, there have been

multiple disturbingly long periods where Petitioner has been incommunicado.  During

those times, neither his family nor his lawyers knew Petitioner's location, why he was

being moved, where he was being moved, or whether Petitioner was alive.

102.     Petitioner has been denied proper medical care in each facility that he has been housed in.  Petitioner was put in solitary when he had COVID-19, he was not taken to a hospital.  Because he is purposefully being fed non-celiac-safe food, Petitioner has lost almost 40 pounds since arriving at NNRJ on December 20, 2021.  Petitioner has been denied hospitalizations despite being in excruciating amounts of celiac-related pain. Petitioner routinely has medicine and food crucial to his survival confiscated for punitive reasons.

103.     Petitioner has not been outside in over six months and has endured long periods of time in poorly ventilated, dimly lit, and damp cells.  Many of those cells contained black mold, insects, vermin,[22] and rusted metal. Petitioner is regularly denied toiletries and the ability to shower.  He has been robbed of his personal belongings by the staff at six different prisons.  His food, money, family photos, and legal papers have been taken without explanation and never returned.  Not only has this course of conduct continued across each facility, but the malice, intensity, and duration of Petitioner's mistreatment have increased as well.

104.     For instance, when Petitioner arrived at NNRJ, he was purposefully put into a pod full of COVID-positive people.  Given the fact that Petitioner has a serious underlying medical condition, this deliberate act can only be described as an attempt by the jail to end Petitioner's life.

---

[22] "This morning there was a full-grown mouse or a smaller rat on the breakfast tray cart.  It was told to C.O. Schafer.  It was killed by the tray server (crushed).  I have been personally complaining about the roaches and mice in the kitchen for weeks.  This place is disgusting… After the rodent was found, the trays were served." (*See* EXHIBIT A page 32)

105.     Unlike other January 6th detainees who occupy what is called the "Honor Pod," Petitioner is forced to live in dangerous sections of the jail that are notorious for housing the Bloods, MS-13, and highly dangerous Cartel members.  NNRJ does this to punish Petitioner by making him live in a constant state of fear and anxiety about what may happen to him at any given moment. A-Pod is one of those dangerous locations.

106.     On March 5, 2022, Petitioner was confronted by a ranking member of an international street gang over the phone in A-Pod.  Shortly thereafter, Petitioner was attacked and wound up receiving eight stitches next to his right eye.  Upon returning from receiving his stitches, Petitioner was sentenced to 45 days of solitary confinement and had his ointment and medication taken from him.  Petitioner's right eye was completely shut for the first eight days and blood red for almost two weeks.

## VII.     RIGHT TO COUNSEL VIOLATIONS

107.     Petitioner's attorney-client privileged calls are routinely and illegally monitored, which is something that has happened since he was first detained.   Attorney McBride has been on multiple phone calls with Petitioner where Petitioner was forced to speak to McBride in a non-secure room, which prompted McBride to end those calls over security concerns.

108.     NNRJ does not hide the fact that it is listening to privileged calls.  After one call, where McBride brought a member of his team on to speak with Petitioner.  NNRJ informed Petitioner that he was only allowed to speak to Attorney McBride on the phone.  Petitioner informed NNRJ that it was illegal for the jail to listen to calls between attorneys and clients. NNRJ then informed Petitioner that it did not like the content of the call, banned Petitioner

from making legal calls for 15 days, and then put Petitioner in solitary confinement for speaking up about the violation of his rights.

109.     Attorney McBride visited Petitioner in person when he was detained at Essex County Correctional Facility.  McBride twice tried to visit Petitioner at DC Jail but was denied each time. Because of the Pandemic and the fact that Petitioner has been moved to multiple different jails without explanation or notice, because of this Petitioner and McBride have used Securus Video calls as their primary vehicle to communicate.

110.     As mentioned above, Attorney McBride contacted Superintendent Ted Hull on March 9, 2022, after Petitioner failed to show up for a video conference. NNRJ prevented McBride from seeing Petitioner on a Securus video call until March 15, 2022, which is a full ten days after Petitioner was assaulted. Seeing that Petitioner's condition had deteriorated to the point where he objectively looked like he could die, McBride memorialized a portion of the conversation in a video recording. Superintendent Hull has since revoked attorney McBride's ability to use Securus Video calling any longer.  Hull has cited no rule or justification for his decision but has simply stated "You HAVE abused the video visitation system and it is a privilege not a right.......take Inmate Quaglin's call or drive here and visit with Inmate Quaglin."

**VIII.   PETITIONER HAS NEVER SEEN THE DISCOVERY IN HIS CASE**

111.     Previous Counsel dropped off discovery to Petitioner at Essex County Correctional Facility, but Petitioner never saw it.  Petitioner never saw his discovery at FTC Oklahoma. Attorney McBride dropped off a one terabyte hard drive containing Petitioner's discovery to DC Jail's Kimberlee Lewis on September 24, 2021, but Petitioner never saw it. Petitioner never saw his discovery at BOP Lewisburg.  Petitioner has never seen his

discovery while being detained at NNRJ, even though Attorney McBride has on multiple

occasions noticed NNRJ and Superintendent Hull of Petitioner's constitutional right to

meaningfully participate in his own defense. For example, Attorney McBride recently

made the following statement to Superintendent Hull:

> Mr. Quaglin has not been able to view his discovery which was
> dropped off to him months ago.  As you are aware, Mr. Quaglin has
> a constitutional right to participate in his defense, and because of the
> pandemic, the ability to video conference is paramount.  Please give
> him his discovery, immediately.

(*See* **Exhibit D**: McBride-Hull March 2022, Email Exchange).

112.      The Department of Justice has made discovery available to January 6th Defendants

on the Relativity and evidence.com databases, even so, Petitioner has never been able to

use either of them.

### IX.      THE GRIEVANCE PROCESS IS IRRETRIEVABLY BROKEN

113.      Petitioner has filed multiple grievances regarding the abovementioned wrongful

acts and the conditions of confinement in all six facilities that have housed him.  His

grievances are routinely thrown in the trash, ignored, or falsely marked as having been

sufficiently addressed.  DC Jail and NNRJ are the worst offenders in this regard.

114.      These violations of the administrative process are not limited to Petitioner but are

inclusive of the entire January 6th Detainee Cohort.  This purposeful obfuscation of the

grievance process is a calculated decision by the jails to prevent Petitioner and others like

him from being able to demonstrate that he or they have exhausted all administrative

remedies, because doing so, will delegitimize detainee claims of misconduct and kill any

civil rights lawsuits and/or habeas petitions at conception.

115.    This accusation is not a hunch or an educated guess, but rather the product of more

than fourteen months of investigation, during which, the jail guards regularly stated their

intention to avoid being sued for their despicable behavior, by forging fake signatures and

refusing to sign grievances to avoid being identified.  All the while, jail leadership mocked,

ridiculed, and retaliated against Petitioner and other J6 detainees for having the audacity to

grieve them. None of this is related to any legitimate institutional goal.  All of this is

designed to intimidate, silence, punish, and ensure that the grievance process fails.  And by

doing so, they send a message to these American citizens that they should shut up or face

torture.

## X.    LEGAL STANDARD

116.    The practice of arbitrary imprisonment has been, in all ages, the favorite and most

formidable instrument of tyranny. The observations of the judicious Blackstone ... are well

worthy of recital: 'To bereave a man of life ... or by violence to confiscate his estate,

without accusation or trial, would be so gross and notorious an act of despotism as must at

once convey the alarm of tyranny throughout the whole nation; but confinement of the

person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is

a less public, a less striking, and therefore a more dangerous engine of arbitrary

government.' And as a remedy for this fatal evil, he is everywhere peculiarly emphatical

in his encomiums on the habeas corpus act, which in one place he calls 'the BULWARK

of the British Constitution.[23]

---

[23] *See Boumedine v. Bush,* 553 U.S. 723, 128 S.Ct. 2229 (2008) Quoting Hamilton C. Rossiter ed.,
p. 512 (1961) (quoting 1 Blackstone *136, 4 id., at *438).

117.    The Suspension Clause ensures that, except during periods of formal suspension of writ of habeas corpus, the judiciary will have a time-tested device, the writ, to maintain the delicate balance of governance that is itself the surest safeguard of liberty.

118.    A federal district court is authorized to grant a writ of habeas corpus under 28 U.S.C. § 2241 where a petitioner is "in custody under or by the color of the authority of the United States . . . in violation of the Constitution or laws or treaties of the United States.[24]

119.    Aside from § 2241, this Court has jurisdiction under 28 U.S.C. § 1331, as an equitable cause of action under the Constitution.[25]  Sections 2201–02 of Title 28 of the United States Code further provide that a court may, upon the filing of an appropriate pleading, declare the rights and other legal relations of any party seeking such declaration.

## XI.    CONDITIONS OF CONFINEMENT CLAIMS ARE PROPER IN HABEAS

120.    The Supreme Court has not definitively ruled as to whether a conditions of confinement claim is proper in habeas but has instead called it an open question.[26]  In lieu of a definitive ruling from the Supreme Court, circuit courts have stepped in to fill the void, One cohort of circuits favor of a conditions of confinement claims while others oppose it.

---

[24] *See* 28 U.S.C. §§ 2241(c)(1), (3). For an excellent analysis of the applicability of relief under Section 2241 for prison conditions, see Note, *A Textual Argument for Challenging Conditions of Confinement Under Habeas* 135 Harv. L. Rev. 1397 (Mar 10, 2022). https://harvardlawreview.org/2022/03/a-textual-argument-for-the-challenging-conditions-of-confinement-under-habeas/

[25] *See Ziglar v. Abbasi* at 137 S. Ct. at 1865 (detainees challenging conditions of confinement could seek an injunction)

[26] *See Ziglar v. Abbasi* at 1863 (citing *Bell v. Wolfish*, 441 U.S. at 526;a Preiser 411 U.S. at 499)

121.     Regarding the circuits, the D.C. and Second Circuits allow for conditions of confinement claims to proceed under habeas.  Specifically, in 2014 the D.C. Circuit in Aamer v. Obama, reasoned that custody may be illegal due to "the fact of detention, duration of detention, the place of detention, or the conditions of detention."[27]  And in all such cases, "the habeas petitioner's essential claim is his custody violates the law, and he may employ the writ to remedy such illegality.  The Second Circuit has also "long interpreted § 2241 of the habeas statutes as applying to challenges of prison conditions"[28]

122.     In conditions of confinement claims, a habeas petitioner's rights may be vindicated by an order of transfer, an order enjoining the government from continuing to treat the petitioner in the challenged manner, or the court may order the petitioner released because the unlawful conditions cannot be rectified.[29]

## XII.    THE DUE PROCESS RIGHTS OF PRETRIAL DETAINEES

123.     The Due Process Clause of the Fifth Amendment forbids the government from depriving a person of life, liberty, or property without due process of law.[30]

124.     Pretrial detainees have a Constitutional right to be free from punishment prior to conviction.[31] To establish punishment, proof of intent or motive to punish is not necessary, rather, a pretrial detainee can prevail on a claim that his due process rights were violated

---

[27] *See Aamer v. Obama* 742 F.3d 1023, 408 U.S.App.D.C. 291 (2014)

[28] *See Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008)

[29] *See* 28 U.S.C.A. § 2241.  Aamer v. Obama 742 F.3d 1023, 408 U.S.App.D.C. 291 (2014)

[30] *See* U.S. Const. amend. V.

[31] *See Bell v. Wolfish*, 441 U.S. 520, 99 (1979) ("holding that, under Due Process Clause, a detainee may not be punished prior conviction").

by providing objective evidence that a challenged governmental action is not related to a legitimate governmental objective or that it is excessive in relation to that purpose.[32]

125.     Regarding conditions of confinement, the proper avenue for relief for pretrial relief is the Fifth Amendment's due process clause, which is triggered when a pretrial detainee can demonstrate that their conditions of confinement subject them to exposure to serious illness, especially illness related to a preexisting condition that can lead to death.[33]

126.     Because pretrial detainees are presumed innocent, they are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. The threshold question "is whether the prison conditions amount to punishment of the detainee." A condition amounts to punishment if it is "not reasonably related to a legitimate institutional goal".[34]

---

[32] *See Kingsley v. Hendrickson,* 576 U.S, 389m 135 S.Ct. 2466, 192 L.Ed,2d 416 (2015) (citing *Younberg v. Romero,* 457 U.S. 307, 322, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)).

[33] *See United States v. Martin*, 447 F.Supp.3d. 999 (D.Md. 2020); *see also Bell v. Wolfish*, 441 U.S. 520, 535, 239, 99, S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also Kingsley v. Hendrickson*, 576 U,S, 389m 135 S.Ct. 2466, 192 L.Ed,2d 416 (2015) (citing *Younberg v. Romero*, 457 U.S. 307, 322, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). *United States v. Riggins*, 456 F.Supp.3d 138 (2020) citing *Hardy v. District of Columbia,* 601 F.Supp. 2d 182,188 (D.D.C. 2009).

[34]*See United States v. Riggins*, 456 F.Supp.3d 138 (2020) citing Hardy v. District of Columbia, 601 F.Supp. 2d 182,188 (D.D.C. 2009).

## XIII.   DELIBERATE INDIFFERENCE

127.     A pretrial detainee's constitutional right to be free from punishment includes the right to reasonable safety and medical care.[35] A prison official violates these rights when he acts with "deliberate indifference" to detainees' safety or serious medical needs.[36]

128.     A showing of deliberate indifference requires "that officials had subjective knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." *Baker v. District of Columbia,* 326 F.3d 1302, 1306 (D.C. Cir. 2003). In order to establish deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference*." Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

129.     A showing of irreparable harm. "[P]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) (quoting 11A Charles Alan Wright, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL Practice and Procedure § 2948.1 (2d ed.2013)). "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F.

---

[35] *See Gordon v County of Orange,* 888 F.3d 118, 1124–25 (9th Cir. 2018).

[36] *Id.; Castro v. Los Angeles,* 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc).

Supp. 2d 190, 204 (D.D.C. 2005) (citations and internal quotation marks omitted, emphasis in original).

### XIV.   SOLITARY CONFINEMENT IS PUNISHMENT

130.    Solitary confinement is a tool that has been used to punish prisoners for thousands of years.   The Book of Daniel describes two harrowing instances of King Nebuchadnezzar's implementation of solitary confinement, first in the fiery furnace[37] and second in the lion's den.[38]   The Prophet Jeremiah was famously placed in solitary confinement in the cistern of Malkijah.[39]   Approximately 800 years later, St. John the Evangelist is exiled to the island of Patmos by the Roman Emperor Domitian.[40]

131.    Joseph Stalin regularly used solitary confinement to punish political dissidents.  For instance, Semyon Samuilovich Vilensky was charged with intent to commit acts of terror and sentenced to ten years of imprisonment simply for reading an anti-Stalin poem out loud. "I was put in a narrow cell with a concrete floor. The window had bars and thick glass that let in little light."[41]

132.    Nelson Mandela was sentenced to life in prison by South Africa's Apartheid Regime.  At Robben Island Prison, he spent years languishing in solitary confinement. "I found solitary confinement the most forbidding aspect of prison life. There is no end and

---

[37] *See* the Book of Daniel Chapter 3

[38] *See* the Book of Daniel Chapter 6

[39] *See* the Book of Jeremiah Chapter 38

[40] *See* the Book of Revelation Chapter 1

[41] *See* https://www.opendemocracy.net/en/odr/comrade-stalins-secret-prison/

no beginning; there is only one's mind, which can begin to play tricks. Was that a dream or did it really happen? One begins to question everything."[42]

133.     The practice of solitary confinement begins in the United States Eastern State Penitentiary in Philadelphia in 1829. It is based on a belief that prisoners isolated in stone cells with only a Bible would use the time to repent, pray and find introspection.[43]  In 1890, U.S. Supreme Court Justice Samuel Freeman Miller found that " A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."

134.     In an October 31, 2019, letter to the Department of Homeland Security's Officer for Civil rights and Liberties (CRCL), Senator Elizabeth Warren questioned the Federal Government's abuse of detainee rights via the use of solitary confinement, stated:

> And now a new set of reports indicate that ICE has continued to overuse and misuse solitary confinement to house detainees who have mental or physical disabilities or otherwise may be especially vulnerable and in need of protection. At least three detainees "with mental illness who have been put in solitary" have died by suicide in the last three years, and another suicide of a detainee held in solitary was reported just this month.  It is crucial that the federal government deploy every available tool to stop the abuse of solitary confinement and prevent another avoidable death."
>
> –Senator Elizabeth Warren

---

[42] *See Nelson Mandela's* 1994 autobiography The Long Walk to Freedom

[43] https://www.npr.org/templates/story/story.php?storyId=5579901

## XV. THE HUMANE ALTERNATIVES TO LONG-TERM SOLITARY CONFINEMENT ACT

135.     On March 18, 2021, New York State Governor Andrew Cuomo banned the use of prolonged solitary confinement in New York State, when he signed into law the Humane Alternatives to Long-Term Solitary Confinement Act (HALT), which adopted the United Nations Standard for Minimum Rules for the Treatment of Prisoners, a.k.a. The Nelson Mandela Rules.

136.     HALT bans the use of solitary confinement for any period for those with mental or physical disabilities, pregnant women, those in the first 8 weeks of postpartum recovery, inmates under 21, as well as inmates who are older than 55.

137.     HALT also requires that solitary confinement be used only for "serious conduct" such as the risk of "imminent physical injury" and that all inmates in solitary be offered at least four hours of recreation outside of their cells, as well as one hour of outdoor time.

138.     Importantly, HALT defines prolonged solitary confinement as solitary confinement for more than 15 consecutive days and bans the use of prolonged solitary confinement. HALT also forbids more than 20 days of solitary confinement during any 60-day period.

139.     While New York law is not controlling authority in this case, Petitioner believes that this law can inform the Court's analysis of the unlawful conduct in this case, especially because of the damage that the inhumane practice of solitary confinement can cause, and because solitary confinement does not properly address the root causes that lead to **punishment.**

> It is no secret that the use of solitary confinement is inhumane, unethical, and constitutes torture under international law if it extends more than fifteen days. It must be discontinued immediately. The passage of HALT in the Senate brings us one step closer to bringing justice to all those who have lost loved ones to the wrongful use of solitary, and the New Yorkers who have been victims of this state-

sanctioned torture. This monumental achievement wouldn't be possible without the efforts led by survivors of solitary and their family members, and I am thankful for their tireless advocacy. As the lead sponsor of this bill, I am grateful for the support of the leadership in bringing this bill to the floor, as we seek to create more humane and effective alternatives to harmful incarceration across our state.

Senator Julia Salazar, Chair of the Senate Committee on Crime Victims, Crime and Correction

## XVI.   THE UNITED NATIONS STANDARD FOR MINIMUM RULES FOR THE TREATMENT OF PRISONERS:  THE NELSON MANDELA RULES

140.    International human rights and health organizations have roundly denounced the use of prolonged solitary confinement as a form of torture.[44] The World Health Organization, United Nations, and other international bodies have also recognized solitary confinement as greatly harmful and potentially fatal. In 2016, the National Commission on Correctional Health Care issued guidance to correctional health officials explaining that a period of confinement beyond 15 consecutive days is "inhumane, degrading treatment, and harmful to an individual's health."[45]

141.    The United Nations Standard Minimum Rules for the Treatment of Prisoners (SMRs) were initially adopted by the UN Congress on the Prevention of Crime and the Treatment of Offenders in 1955 and approved by the UN Economic and Social Council in 1957.   On December 7, 2015, a revised version of the Standard Minimum Rules was adopted unanimously by the 70th session of the UN General Assembly in Resolution

---

[44] *See* Solitary confinement should be banned in most cases, UN expert says, UN News (Oct. 18, 2011), https://news.un.org/en/story/2011/10/392012-solitary-confinement-should-be-banned-most-cases-un-expert-says (defining solitary in excess of 15 days as a form of torture).

[45] *See* Nat'l Commission on Correctional Health Care, Position Statement on Solitary Confinement (Isolation), https://www.ncchc.org/solitary-confinement.

A/RES/70/175. This followed a four-year revision process after a 2010 UN General Assembly resolution which requested revision of the SMRs 'so that they reflect recent advances in correctional science and best practices. The revised Rules are known as the Nelson Mandela Rules, which honor the legacy of the late President of South Africa, Mr. Nelson Mandela, who spent so many years of his life in prison.

142.     Rule 1: All prisoners shall be treated with the respect due to their inherent dignity and value as human beings. No prisoner shall be subjected to, and all prisoners shall be protected from, torture and other cruel, inhuman, or degrading treatment or punishment, for which no circumstances whatsoever may be invoked as a justification. The safety and security of prisoners, staff, service providers, and visitors shall be ensured at all times.

143.     Rule 43 states that under no circumstances may restrictions or disciplinary sanctions amount to torture or other cruel, inhumane, or degrading treatment or punishment.

## XVII. PROLONGED SOLITARY CONFINEMENT IS TORTURE

144.     Rule 43 section 1 specifically enumerates and prohibits: (a) Indefinite solitary confinement; (b) Prolonged solitary confinement; (c) Placement of a prisoner in a dark or constantly lit cell; (d) Corporal punishment or the reduction of a prisoner's diet or drinking water; (e) Collective punishment.

145.     Rule 43 section 3 states that disciplinary sanctions or restrictive measures shall not include the prohibition of family contact. Family contact may only be restricted for a limited time, as is strictly required for the maintenance of security and order.

146.     Rule 44 defines solitary confinement as confinement for more than 22 hours a day

absent meaningful human contact, and prolonged solitary confinement as 15 consecutive

days or more of solitary confinement.

147.     Rule 45 states that the imposition of solitary confinement is prohibited in the case

of prisoners with mental or physical disabilities when their conditions would be

exacerbated by such measures.

### XVIII. THE PRISON LITIGATION REFORM ACT'S (PRLA) OF 1995's EXHAUSTION OF ADMINISTRATIVE REMEDIES REQUIREMENT

148.     The PRLA requires that a prisoner exhaust his administrative requirements with the

correctional institution prior to filing suit.  A prisoner fulfills his duty under the PRLA to

exhaust his administrative remedies by adhering to specific procedures and deadlines

established by prison policy.  PRLA §101(a), 42 U.S.C.A. §1997(e)(a). A prisoner cannot

be required to exhaust his administrative remedies prior to bringing suit if such remedies

are not available to him. 42 U.S.C.A. §1997(e)

149.     An administrative procedure is unavailable when (despite what regulations or

guidance materials may promise) it operates as a simple dead end—with officers unable or

consistently unwilling to provide any relief to aggrieved inmates. *Booth v. Churner*, 532

U.S. 731 (2001) Suppose, for example, that a prison handbook directs inmates to submit

their grievances to a particular administrative office—but in practice that office disclaims

the capacity to consider those petitions. The procedure is not then "capable of use" for the

pertinent purpose. In *Booth 's* words: "[S]ome redress for a wrong is presupposed by the

statute's requirement" of an "available" remedy; "where the relevant administrative

procedure lacks authority to provide any relief," the inmate has "nothing to exhaust." *Id.,*

at 736, and n. 4, 121 S.Ct. 1819. So too if administrative officials have apparent authority

but decline ever to exercise it. Once again: "[T]he modifier 'available' requires the possibility of some relief." Id., at 738, 121 S.Ct. 1819. When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy. *Ross v. Blake,* 578 U.S. 632, 643, 136 S. Ct. 1850, 1859, 195 L. Ed. 2d 117 (2016)

150.    The same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. In Woodford, we recognized that officials might devise procedural systems (including the blind alleys and quagmires just discussed) to "trip up all but the most skillful prisoners." *Woodford v. Ngo* 548 U.S., at 102, 126 (2006)

151.    Appellate courts have also addressed a variety of instances in which officials misled or threatened individual inmates to prevent their use of otherwise proper procedures. As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable. And then, once again, § 1997e(a) poses no bar. *See, e.g., Davis v. Hernandez,* 798 F.3d 290, 295 (C.A.5 2015) ("Grievance procedures are unavailable ... if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process" (emphasis deleted*)); Schultz v. Pugh*, 728 F.3d 619, 620 (C.A.7 2013) ("A remedy is not available, therefore, to a prisoner prevented by threats or other intimidation by prison personnel from seeking an administrative remedy"); *Pavey v. Conley,* 663 F.3d 899, 906 (C.A.7 2011) ("[I]f prison officials misled [a prisoner] into thinking that ... he had done all he needed to initiate the grievance process," then "[a]n administrative remedy is not 'available' "); *Tuckel v. Grover*, 660 F.3d 1249, 1252–1253 (C.A.10 2011) ("[W]hen a prison official inhibits an inmate from utilizing an administrative process through threats

or intimidation, that process can no longer be said to be 'available' "); *Goebert v. Lee County*, 510 F.3d 1312, 1323 (C.A.11 2007) (If a prison "play[s] hide-and-seek with administrative remedies," then they are not "available").

## XIX.   PETITIONER IS EXCUSED FROM PRLA'S EXHAUSTION REQUIREMENT BECAUSE THE GRIEVANCE PROCEDURE IS UNAVAILABLE

152.     The PRLA's requirement that Petitioner exhausts his administrative requirements with the correctional institution prior to filing suit cannot be met through no fault of his own.   An administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. *See Booth v. Churner*, 532 U.S. 731 (2001).

153.     In the context of pretrial detention, to exhaust administrative procedures, detainees must follow the policies and procedures of the facility relating to complaints or grievances. For example. A detainee must file a grievance or complaint, then wait for the facility to respond, the detainee must appeal any adverse ruling, finding, or conclusion.  If there is a hearing process, the detainee must go through that as well, prior to suing in federal court.

154.     Petitioner has filed a multitude of grievances since first being detained in April 2021.  Petitioner's grievances are filed in compliance with the procedures and deadlines established by prison policy that is provided to Petitioner in the prison handbook, be that as it may, the staff at NNRJ simply refuses to entertain Petitioner's grievances and/or creates a litany of roadblocks preventing the process from playing out at all— then the grievance process is unviable and therefore unavailable, as a matter of law. *See Ross v. Blake,* 578 U.S. 632, 643, 136 S. Ct. 1850, 1859, 195 L. Ed. 2d 117 (2016)

155.     This is corroborated by the fact that Petitioner has filed multiple grievances regarding the abovementioned wrongful acts and the conditions of confinement in all six facilities that have housed him.  Petitioner's grievances have been routinely thrown in the trash, ignored, or falsely marked as having been sufficiently addressed.  DC Jail and NNRJ are the worst offenders in this regard.

156.     These violations of the administrative process are not limited to Petitioner but are inclusive of the entire January 6th Detainee Cohort.  This purposeful obfuscation of the grievance process is a calculated decision by the jails to prevent Petitioner and others like him from being able to demonstrate that he or they have exhausted all administrative remedies because doing so, will delegitimize detainee claims of misconduct and kill any civil rights lawsuits and/or habeas petitions at conception.

157.     This accusation is not a hunch or an educated guess, but rather the product of twelve months of Petitioner futilely attempting to utilize the grievance process to help him obtain celiac safe food and discovery.  Petitioner is forced to speak up three times per day because of the food situation in NNRJ.  It was the same at DC Jail as well. Petitioner must often speak up while in great amounts of pain.  The guards normally interpret Petitioner's wincing as Petitioner being a whining complaining troublemaker, so they regularly punish him for it.

158.     NNRJ guards also regularly state their intention to avoid being sued for their despicable behavior, by forging fake signatures and refusing to sign grievances to avoid being identified.  All while jail leadership mocks, ridicules, and retaliates against Petitioner and other J6 detainees for having the audacity to grieve them.  "In Woodford, we

recognized that officials might devise procedural systems to trip up all but the most skillful prisoners. *See Woodford v. Ngo*, 548 U.S., at 102, 126 (2006)

159.     The staff and leadership at NNRJ and DC Jail work hard to thwart detainees from being able to take advantage of the grievance process through machination, misrepresentation, and intimidation to ensure that the grievance process fails.  And by doing so, communicate to these American citizens that they should shut up or face torture. "When a prison official inhibits an inmate from utilizing an administrative process through threats or intimidation, that process can no longer be said to be available." *See Tuckel v. Grover,* 660 F.3d 1249, 1252–1253 (C.A.10 2011)

160.     They also often mislead individuals as to those the proper grievance procedures are, and by doing so, have made the grievance process unavailable to Petitioner.  As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable. And then, once again, § 1997e(a) poses no bar.  *See Davis v. Hernandez,* 798 F.3d 290, 295 (C.A.5 2015) ("Grievance procedures are unavailable ... if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process" (emphasis deleted))

161.     These accusations are also corroborated by the fact that after a surprise inspection the U.S. Marshalls declared that the grievance process is broken at DC Jail.  An internal audit of the jail also declared the same.  "An administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *See Booth v. Churner*, 532 U.S. 731 (2001)

162.     These are precisely the kinds of situations that the case law seeks to protect inmates and detainees against.  "When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy.  *See Ross v. Blake,* 578 U.S. 632, 643, 136 S. Ct. 1850, 1859, 195 L. Ed. 2d 117 (2016)

163.     Having established that the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy.  *See Ross v. Blake,* 578 U.S. 632, 643, 136 S. Ct. 1850, 1859, 195 L. Ed. 2d 117 (2016)

## XX.     CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### RESPONDENT'S DELIBERATE INDIFFERENCE TO PETITIONER'S SAFETY AND MEDICAL NEEDS VIOLATES THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION'S DUE PROCESS CLAUSE

164.     Petitioner incorporates and realleges paragraphs 1-163 by reference and alleges that Respondent Garland and Respondent Hull are subjecting him to unlawful pretrial detention amounting to punishment by acting in deliberate indifference to his health and safety.

165.   Respondents have long known that Petitioner is a pretrial detainee with celiac disease, a preexisting medical condition that he notified Respondents of the moment he was detained. Petitioner's medical history is well documented in his medical records and detainee file, which follow him each time he is moved.  Petitioner's attorneys have made multiple records in this Court regarding the seriousness of Petitioner's condition and the fact that Petitioner has suffered greatly during his time as a detainee.

166.     Importantly, at Petitioner's August 5, 2021, Status Hearing, Attorney McBride argued that Petitioner should not be moved to DC Jail because Petitioner had already

greatly suffered from Essex County Correction Facility's negligent handling of Petitioner's food. McBride referenced amongst other things, the fact that Petitioner had lost 25+ pounds in a matter of weeks and had his body had previously been covered in blisters. McBride also highlighted that he filed an EMERGENCY REQUEST TO INVESTIGATE MISTREATMENT OF PRE-TRIAL DETAINEES with Amnesty International and the ACLU regarding the mistreatment and denial of medical care to January 6th Detainees at DC Jail.

167.    DC Jail had full knowledge of Petitioner's preexisting medical condition when Petitioner arrived. Even so, DC Jail did not honor his dietary needs. Multiple grievances and conflicts ensued as a result. Petitioner was routinely punished when he asked for celiac-safe food. He was punished when he wrote grievances. He was labeled insolent and non-compliant by the jail and targeted as someone to be punished through no fault of his own.

168.    Respondents' utter disregard for Petitioner's serious underlying medical condition is well-documented, reprehensible, and indefensible. Respondents removed "Cream of Wheat" labels from the containers, told Petitioner he was being fed gluten-free cornmeal, fed it to him for weeks, and by doing so, intentionally poisoned him. There is no justification for locking a sick detainee in prolonged solitary confinement because he is complaining of bleeding from his rectum and is in excruciating pain because you are literally poisoning him. There is no justification for tossing a detainee's grievances into the garbage and/or fraudulently marking them as completed when they were never honored. There is no justification for locking an emaciated detainee in your care in prolonged

solitary confinement because he is complaining that he is starving. These disgusting actions are clear evidence of deliberate indifference to Petitioner's medical condition.

169.    NNRJ had full knowledge of Petitioner's preexisting medical condition when Petitioner arrived. As demonstrated above, Respondent Hull was put on notice by Attorney McBride during the week of December 26, 2021, and NNRJ's Board was noticed on December 30, 2021. McBride notified Hull about multiple celiac-related complications and needless suffering that Petitioner was enduring at NNRJ, including the fact that Petitioner had lost 30 pounds of body weight. McBride explained to Hull that McBride knew Hull knowingly put Petitioner into a COVID+ pod and then locked Petitioner in solitary confinement absent medical care. McBride demanded that Hull cease and desist, yet Hull has increased the severity of Petitioner's mistreatment since that time.

170.    Respondent Garland has been on notice about Petitioner's medical condition since the inception of this case. As mentioned above, multiple records have been made in court concerning Petitioner's ongoing dire medical situation. On January 3, 2022, fourteen members of Congress sent then BOP Director Carvajal a letter specifically addressing Petitioner's dire medical situation. Shortly thereafter, Respondent Garland accepted Director Carvajal's resignation. Despite this reality, Respondent Garland has done nothing to ensure Petitioner's safety.

171.    Respondents, since the inception of this case, have had subjective knowledge of Petitioner's serious medical condition, and the corresponding need of being fed celiac safe food. Not only were they aware that a risk of substantial harm existed— but was noticed.

172.    As mentioned above, Attorney McBride has on several occasions notified Respondents of Petitioner's declining health and dramatic weight loss due to being fed

non-celiac safe food. Respondents have also moved Petitioner six times over the course of the past year and have failed six times to feed Petitioner correctly. This is not negligence, nor is it a mistake, it is purposeful and deliberate torture

173.     Respondents have not only drawn the inference that the risk of serious harm from their actions was imminent, but with full knowledge, and on multiple occasions, used Petitioner's condition to harm him, and by doing so knowingly, recklessly, purposefully, and wantonly disregarded Petitioner's extreme pain and suffering, as well as the short and long-term damage that it would do to Petitioner's health.

174.     Respondents' wanton disregard for Petitioner's serious preexisting medical condition has already caused irreparable harm and a substantial likelihood that continued detention will result in catastrophic harm or even death. As mentioned above, Petitioner has been moved six times since he was first detained in April of 2021. Respondents have failed to properly care for Petitioner six out of those six times. What began as negligence in Essex County Correctional Facility and then deliberate indifference / targeted punishment at DC Jail, has now metastasized into targeted medical abuse and cruel and unusual punishment at NNRJ. One needs to look no further than the above-mentioned email exchanges between Respondent Hull and Attorney McBride for proof.

175.     It is certain that Petitioner has been irreparably harmed by Respondents' repeated unlawful conduct. As noted above, Celiac disease is a chronic digestive and immune disorder that damages the small intestine. The disease is triggered when one eats any food containing gluten. This means that Petitioner's immune system has long been attacking the absorptive lining of his gastrointestinal tract.

176.     This is why Petitioner has lost almost 40 pounds of body weight— is in excruciating pain and has a gluten-related skin disorder causing itchy blisters all over his skin. This is also why he has chronic diarrhea, abdominal cramping, bloating, gas, muscle wasting, weakness, fatigue, and joint pain.

177.     The law requires further that Petitioner prove a substantial likelihood that continued detention will result in continued harm.  The abovementioned facts provide overwhelming evidence that Respondents can no longer be trusted to hold Petitioner in their custody because Respondents are utterly incapable of properly caring for Petitioner.

178.     Not only have Respondents failed to meet Petitioner's basic dietary needs they have also maliciously weaponized his medical condition against him in cruel and unusual fashion. This is corroborated by the fact that Petitioner— a United States citizen Pretrial detainee with a serious underlying medical condition, with no criminal record or prior history of violence, languishes in prolonged solitary confinement at this very moment.

179.     He has eight stitches on the side of his face.  He is purposefully being fed non-celiac-safe food.  He is bleeding from his rectum.  He has lost almost 40 pounds of body weight.  Catastrophic harm continues at this very moment. Petitioner will soon perish if he is not immediately released into the custody of his wife Moria, a Registered Nurse, who will see to it that he receives medical care at home during the times that he is not recovering in the hospital.

## SECOND CLAIM FOR RELIEF
## RESPONDENT'S ILLEGAL USE OF SOLITARY CONFINEMENT TO PUNISH PETITIONER VIOLATES THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION'S DUE PROCESS CLAUSE

180.     Petitioner incorporates and realleges paragraphs 1-179 by reference and alleges that Respondent Garland and Respondent Hull are illegally punishing him in violation of his constitutional rights, by repeatedly placing him in solitary confinement.

181.     There are serious moral questions regarding whether the medieval practice of solitary confinement is acceptable in our modern world. Eighteen states have banned or limited the practice of solitary confinement.  New York State law and United Nations recognize solitary confinement as a form of punishment and prohibit its use against persons with physical or psychological disabilities, pregnant women, those in the first 8 weeks of postpartum recovery, and inmates under 21 or older than 55.

182.     The logic is simple, people who are in a weakened state should not be subjected to solitary confinement, not even for even one day, because solitary confinement is the kind of punishment that will expose an already sick or weakened person to unnecessary suffering or serious complications. The reasonable conclusion, therefore, is that solitary confinement should not be used against pretrial detainees except in a very limited set of circumstances— because pretrial detainees are not allowed to be punished.

183.     Because Petitioner is a pretrial detainee with celiac disease, a severe underlying medical condition, he should have never been placed in solitary confinement— not even for one day.  Be that as it may, Petitioner has spent well over 75% of the last twelve months in solitary confinement.  The evidence, therefore, that his Fifth Amendment due process rights to be free from punishment have been grossly violated— is overwhelming.

**THIRD CLAIM FOR RELIEF**
**RESPONDENT'S ILLEGAL JAILING OF PETITIONER IN PROLONGED SOLITARY**
**CONFINEMENT VIOLATES THE FIFTH AMENDMENT TO THE UNITED STATES**
**CONSTITUTION'S DUE PROCESS CLAUSE AND THE EIGHTH AMENDMENT'S**
**CRUEL AND UNUSUAL PUNISHMENT CLAUSE**

184.     Petitioner incorporates and realleges paragraphs 1-183 by reference and alleges that Respondent Garland and Respondent Hull are subjecting him to cruel and unusual punishment by locking him in prolonged solitary confinement for hundreds of days at a time with the full knowledge that he has a serious preexisting medical condition, and by doing so violating his Fifth and Eighth Amendment rights.

185.     As noted above, prolonged solitary confinement is recognized as torture under New York State and International Law.  The use of prolonged solitary confinement, in the context of pretrial detention, therefore, is flatly illegal because there is no question as to whether prolonged solitary confinement is punishment.  The question is whether it is torture.  New York State and the United Nations say that it is.

186.     Petitioner's time in solitary confinement has been substantial.  He was placed in prolonged solitary confinement for approximately half of his time in Essex County Correctional Facility, which was from April 2021 – to September 2021. He was housed in a group pod during his entire stay at FTC Oklahoma while he awaited transfer to DC Jail, which was from September 2021- to September 20, 2021. Petitioner was locked in prolonged solitary confinement for most of his time at DC Jail, which was from September 20, 2021, to November 9, 2021.  Petitioner was locked in prolonged solitary confinement during his entire stay at BOP Lewisburg, which was from November 9, 2021, to December 17, 2021.  Petitioner was locked in solitary confinement at Alexandria Detention Center, which was from December 17, 2021, to December 20, 2021. Petitioner has been locked in

prolonged solitary confinement for most of his time at Northern Neck Regional Jail, which is from December 20, 2021, until the present. And during the times that he is not locked in solitary confinement, he is housed in extremely violent sections of the jail.

187. According to the ACLU's July 2013 report "A Death Before Dying: Solitary Confinement on Death Row" empirical research consistently demonstrates that prisoners subjected to isolation suffer many of the same symptoms caused by physical torture and demonstrate a litany of negative physiological and psychological reactions including hypersensitivity to external stimuli, perceptual distortions and hallucinations, increased anxiety and nervousness, fears of persecution, lack of impulse control, severe chronic depression, appetite, and weight loss, heart palpitations, withdrawal, blunting of affect and apathy, talking to oneself, headaches, problems sleeping, confused thought processes, nightmares, dizziness, self-mutilation, lower levels of brain function– including a decline in EEG after seven days of solitary, and increased suicide rates. As one prison psychiatrist noted, "it's a psychiatric concept; if you put people in isolation, they will go insane… Most people in isolation will fall apart."[46]

188. The use of prolonged solitary confinement against a convicted inmate with a serious underlying medical condition is unconscionable, and exactly the kind of cruel and unusual punishment that the Eighth Amendment of the United States Constitution is meant to protect against. It is, therefore, particularly egregious and unfortunate that in this case, these horrible acts have been committed against a United States Citizen detainee with a serious underlying medical condition.

---

[46] *See* A Death Before Dying: Solitary Confinement on Death Row @ https://www.aclu.org/sites/default/files/field_document/deathbeforedying-report.pdf (last visited on April 25, 2022)

189.     Petitioner was placed in prolonged solitary confinement for most of his time at DC Jail, which was from September 20, 2021, to November 9, 2021.  Attorney McBride incessantly called DC Jail during Petitioner's time there because McBride wanted to know why Petitioner was being held in prolonged solitary confinement. McBride visited DC Jail multiple times attempting to see Petitioner but was not permitted. Congresswoman Marjorie Taylor Green condemned DC Jail's treatment of Petitioner and other detainees in her report.  Petitioner also filed dozens of grievances during his time at DC Jail, where he stated that he was starving and begged for help. IT DID NOT MATTER.

190.     In an act of retaliation for Representative Green and Gohmert's visit to DC Jail, Petitioner was stripped of his clothes, robbed of his belongings and legal papers, put on a pre-dawn bus on the morning of November 9, 2021, threatened and held incommunicado until Attorney McBride was able to speak with him on December 3, 2021, at 1:00 PM.

191.     Respondents continued to move Petitioner around like a chess piece from DC Jail, to BOP Lewisburg, to Alexandria Detention Center, to NNRJ.  Arriving at NNRJ having not eaten for days, Petitioner was maliciously fed non-celiac safe food by NNRJ.  Attorney McBride complained. Respondents retaliated by purposefully placing Petitioner into a pod of COVID+ people.  After Petitioner, contracted the coronavirus, NNRJ Superintendent Ted Hull locked Petitioner in prolonged solitary confinement and absent medical care.

192.     There have been multiple other circumstances where Petitioner was prescribed medicine, had his medication confiscated and then was held in prolonged solitary confinement.  After being assaulted by a notorious gang member, Petitioner received eight stitches next to his right eye.  He again did not receive adequate medical treatment.  Shortly after returning from the infirmary, Petitioner's medicine was confiscated, and he was

sentenced to 45 days of solitary confinement. Petitioner has lost another five pounds since Attorney Kiyonaga last saw him during an April 22, 2021, court appearance. Petitioner is weaker and sicker than he has ever been. Petitioner is rotting away in prolonged solitary confinement as of the date of this motion, where he will be for the foreseeable future.

193.     Petitioner is a pretrial detainee with celiac disease, a severe underlying medical condition, and under no set of circumstances should he have ever been placed in solitary confinement— not even for one day. Be that as it may, Petitioner has spent well over 75% of the last twelve months in solitary confinement. Petitioner has not stood under the open sky in over six months. No argument can be made that these facts are rationally related to a legitimate institutional goal.

194.     The abovementioned facts and arguments lead to one conclusion— Respondents are brutally punishing Petitioner in violation of his Fifth and Eighth Amendment rights because. Respondents' malice has increased with time and will without question continue if Petitioner is not immediately released.


### FOURTH CLAIM FOR RELIEF
### RESPONDENTS' REPEATED INTERFERENCE WITH PETITIONER'S RIGHT TO COUNSEL AND MEANINGFULLY PARTICIPATE IN HIS DEFENSE VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION

195.     Petitioner incorporates and realleges paragraphs 1-194 by reference and alleges that Respondent Garland and Respondent Hull are subjecting him to unlawful pretrial detention because Respondents have repeatedly and deliberately interfered with Petitioner's Sixth Amendment Right meaningfully participate in his defense.

196.     Petitioner's attorney-client privileged calls have been routinely and illegally monitored since he was first detained. This deliberate interference with the sacred

attorney-client privileged relationship is illegal and violates Petitioner's Sixth Amendment right to counsel.  Petitioner's attorneys have made multiple records and contacted prison officials in six different jails to remedy the problem—no one has helped.

197.     Petitioner also has a constitutional right to meaningfully participate in his defense. Despite this reality, he has been moved six times since being detained. Each time he is moved, he is stripped of his personal effects, notes, and belongings, and legal papers.

198.     Respondent Garland successfully argued for Petitioner to be held without bond during the coronavirus pandemic.  His Department of Justice was granted multiple speedy trial waivers during that time, understanding that discovery would be produced to Petitioner on a rolling basis. Not only has Respondent Garland failed to provide Petitioner with his discovery, but Respondent Garland has also prohibited Petitioner from using the Relativity database to access his discovery for unjustifiable reasons.

199.     The fact, therefore, that Petitioner has been detained for over a year and has never seen the discovery in his case, despite his attorneys' best efforts, is sufficient independent grounds for release.

**FIFTH CLAIM FOR RELIEF**
**RESPONDENTS' REPEATED RETALIATON FOR SPEAKING TO THE PRESS AND MEMBERS OF CONGRESS ABOUT HIS UNLAWFUL CONDITIONS OF DETENTION VIOLATES PETITIONER'S FIRST AMENDMENT RIGHTS TO FREE SPEECH AND RIGHT TO PETITION HIS GOVERNMENT FOR REDRESS OF GRIEVANCES**

200.     Petitioner incorporates and realleges paragraphs 1-199 by reference and alleges that Respondents' mistreatment and punishment of Petitioner while he is in their custody was done in retaliation for exercising his First Amendment rights of speech and to petition Respondents and Members of Congress to redress his grievances.

## VIII.    CONCLUSION

201.        Respondents have repeatedly violated Petitioner's due process rights as a pretrial to be free from punishment while he is being detained for trial.  Respondents have also violated Petitioner's right to be free from cruel and unusual punishment by locking Petitioner in prolonged solitary confinement under circumstances that violate his human and civil rights.  Superintendent Hull has on multiple occasions, in writing, refused to acknowledge Petitioner's rights as a detainee. Attorney McBride: "We remind you that Mr. Quaglin is a pretrial detainee, not an inmate, as such it is illegal to punish him."  Respondent Ted Hull: to us he (Quaglin) is just another inmate and he will receive exactly what every other inmate receives…" Respondent's refusal to recognize Petitioner's constitutional rights as a detainee is illegal and conduct unbecoming of any person overseeing an entire jail.    Not only should Petitioner be  immediately released from his care—NNRJ Superintendent Ted Hull should be relieved of his duties.

202.        Respondents have also treated Petitioner's serious underlying medical condition with deliberate indifference.  Respondents have not only failed to properly care for Petitioner but have weaponized his medical condition against him by purposefully feeding him food that can kill him. He has lost almost forty pounds of body weight and has been sick for over a year due to being poisoned with non-celiac-safe food.  The damage that has already been done to his organs and his gastrointestinal tract has already altered the course of his life.  His risk for developing other serious and potentially even fatal diseases is extremely high as well.   Petitioner is at grave risk for continued serious injury or death if he remains in Respondents' custody, as such, Petitioner must be released at once.

## VIII.   PRAYER FOR RELIEF

203.      Petitioner respectfully requests that this Court:

(1)      Grant this Writ and an Order under 28 U.S.C. § 1331, 28 U.S.C. §§ 2201–02, and Federal Rules of Civil Procedure 57 and 65 declaring that Petitioner is being held in violation of his Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, and to Order the Petitioner to be immediately released from Respondents' unlawful custody;

(2)      Enter a temporary restraining order, preliminary injunction, and a permanent injunction banning the use of solitary confinement and prolonged solitary confinement against pretrial detainees;

(3)      Pending final resolution of this petition, and pursuant to this Court's inherent powers, order Respondents to take all steps necessary to effectuate Petitioner's prompt release to his wife Moria Quaglin or order an expedited hearing on the Petition;

(4)      Award the writ or issue an order directing the Respondents to show cause why the writ should not be granted, pursuant to 28 U.S.C.  2243, within three days;

(5)      Appoint an expert under Federal Rules of Evidence 706 to conduct independent site visits at DC Jail's CTF and NNRJ and make recommendations to the Court about the best practices for housing pretrial detainees;

(6)      Award Petitioner his attorney's fees and costs; and

(7)      Grant such other relief as the Court may deem necessary and appropriate.

Dated: New York, NY
April 26, 2022

Respectfully submitted,

/s/ Joseph D. McBride, Esq.

Bar ID:  NY0403
THE MCBRIDE LAW FIRM, PLLC
99 Park Avenue, 6th Floor
New York, NY 10016
p: (917) 757-9537
e: jmcbride@mcbridelawnyc.com
*Counsel for Petitioner*