**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| v. | ) | 1:21-cr-40 |
| | ) | |
| **QUAGLIN** | ) | |
| _____ | ) | |

## MOTION TO ALTER AND AMEND THE COURT'S DECISION DENYING DEFENDANT'S THIRD MOTION FOR RELEASE

Defendant Christopher Quaglin, by and through counsel, hereby submits this motion to alter and amend the Court's order denying Mr. Quaglin's third motion for release.

On March 14, 2023, a hearing was held before the Court on the Motion. Among the issues to be considered at the hearing were Mr. Quaglin's conditions of confinement over his two-year detention and the fact that he had not been given access to his discovery while detained. Prior to the hearing, the Court stated that it was particularly interested in learning why Mr. Quaglin was moved from Rappahannock Regional Jail to the DC Jail on January 31, 2023.

The Government responded in a short brief filed on February 24, 2023, which simply stated,

> Before being placed at the D.C. Jail, Quaglin was housed at the Rappahannock Regional Jail. The government inquired as to the reason that Quaglin was transferred back to the D.C. Jail, and was informed by the U.S. Marshal Service that Quaglin had been harassing medical staff. At that point, the Rappahannock Regional Jail determined that they would no longer house Quaglin and, thus, the Deputy U.S. Marshal found different accommodations at the D.C. Jail.

The statement was not supported by evidence or affidavit. ECF No. 545. Mr. Quaglin, for his part, alleged that he was moved because Rappahannock would not provide him with medical care or with a 100% gluten free diet as he requires for his celiac disease.

At the hearing the Government was allowed to present evidence in the form of a marshal who spoke on the record and was not put under oath or subject to cross examination by Mr. Quaglin.  He represented to the Court that "I was personally contacted on January 30th, when he was housed at Rappahannock Regional Jail, to remove him.  They no longer wanted to house him there because he was harassing medical staff, including doctors and nurses."  Tr. of Hr'g, 12:19-23.  No evidence or specifics were provided, but the Court credited his statement and ultimately denied Mr. Quaglin's motion.

At the end of the hearing, counsel for Mr. Quaglin stated, "I don't understand why the Government was given a chance to present evidence today that was not briefed; and I would just ask in the future that the government, if they're going to present evidence, that it be briefed so that we have an opportunity to respond to it…But I also intend to file a motion to alter and amend to – if for nothing else to correct the record for some of the things that your Honor respectfully had mentioned in the order just to make suer that the record is correct."  The Court: "I look forward to the motion."  Tr. of Hr'g, 39-40.

Statements were made on the record and Mr. Quaglin needs to correct the record as it effects his motion to release and possibly his sentencing.

Further, Mr. Quaglin is in possession of new evidence relevant to the Motion and to his case in general.  On March 30, the Jail responded to a Grievance submitted by Mr. Quaglin that, *inter alia*, requested the Jail produce the documents in Mr. Quaglin's file.  The documents produced brought to light new evidence that shows the DC Jail has at least one openly discriminatory policy directed specifically at January 6 prisoners like Mr. Quaglin.

**NEW EVIDENCE**

In the document production, the Jail produced a document that shows, unequivocally, that the DC Jail discriminates against January 6 defendants. Exhibit 1. Specifically, the document shows that the DC Jail has a special January 6 classification for all January 6 defendants and adds an astonishing 9 points to their intake classification, making them *de facto* maximum inmates.

For context, all prisoners are subject to an intake evaluation on the day they arrive and are given a score based on certain factors. A score is 10 points or more makes someone a maximum prisoner which subjects them to housing with other maximum prisoners and subjects them to greater restrictions and less privileges than inmates with lower scores.

The first factor in determining how to classify a new inmate is "Severity of Current Offense. (Score most severe offense using the Offense Severity Scale.)" *See* Exhibit 1. The Offense Severity Scale assigns 1 point to an inmate with the "lowest" level offense, and 7 points to an inmate with the "greatest" level of offense. Even the most severe crimes are only assigned a score of 7. After the level of offense is considered, an inmate's score can be reduced or increased based on other factors. Mr. Quaglin for instance was assigned a score of 7 for his offense, but he received a 2-point deduction for his age, a 1-point deduction for education level, and a 1-point deduction for employment, giving Mr. Quaglin a total intake score of 3, and making him a minimum level inmate. In Mr. Quaglin's case, however, the Jail checked a box on the intake form that states "Is Over-Ride of Scored Custody Level Recommended? If yes, give rationale." The Jail checked "yes" and wrote, "J6 inmate Jan. 6 participant arrested after the capitol riot." Just for being a January 6 defendant, the Jail arbitrarily added 9 points, giving Mr. Quaglin a total score of 12, and escalating him to a maximum inmate. Without the January 6 determination, the only way Mr. Quaglin could have achieved a score of 12 is if he had a prior criminal record, a history of

institutional violence, or else a history of escape attempts.  Mr. Quaglin has none of these, but because he was a January 6 defendant, he was elevated to a maximum level inmate.

If he had been accused of the exact same crimes at a Black Lives Matter protest in Washington, DC, on May 31, 2020, he would have received a score of 3 and been a minimum custody inmate.  This new evidence brings into question everything about Mr. Quaglin's pretrial detention.  It is obvious that there is discrimination in the prison system against Mr. Quaglin specifically, and January 6 defendants in general.  There have been many such allegations, by numerous January 6 defendants.  Mr. Quaglin inspires additional ire from the Jails because he has celiac disease which the Jails are not equipped to accommodate, and because he meticulously documents his detention and strictly follows the grievance procedures, which the jails know exposes them to civil liability.

Mr. Quaglin also believes that the intake form was forged after Mr. Quaglin signed it.  Mr. Quaglin filed a contemporaneous grievance that supports his allegation.  Exhibit 2.  On February 2, 2023, the Jail's intake team tried to get Mr. Quaglin to sign the intake form before they filled it out with his score.  Mr. Quaglin refused to do so.  The Jail the filled out the form and gave Mr. Quaglin a score of 11.  He was given 7 points for a severe offense, and then the Jail added another 4 points for "threatening a government official."  Mr. Quaglin filed a grievance that day, which was returned denied on March 10, 2023 – in violation of the Jail's handbook policy.  Mr. Quaglin escalated the grievance to step 2 which was denied on March 17, 2023, but only returned to Mr. Quaglin on March 30.   The grievance is now escalated to step 3.  The grievance states that "Mr. Wilson added 4 points on my D.O.C. Classification for "threatening a government official."  I have been in 7 other facilities and never been classified as max.  I was never charged with threatening anyone.  The first time the classification team tried to have me fill out the classification without

filling it out first – ILLEGAL."   Mr. Quaglin only recently learned through the document production that the Jail added 9 points for being a January 6 defendant, possibly after Mr. Quaglin signed it.

This new evidence should be enough to at least reconsider the third motion for release, because it shows that the jail that he is currently being detained in has unabashed institutionalized animus towards January 6 defendants and has at least one significant policy based on this animus, namely, all January 6 defendants are de fact maximum prisoners.

## LEGAL STANDARD

"[M]otions for reconsideration may be entertained in criminal cases and [courts] have adopted the same standard of review that applies to . . . motions [to alter or amend a judgment] filed in civil cases pursuant to Rule 59(e) of the Federal Rules of Civil Procedure." *United States v. Cabrera*, 699 F. Supp. 2d 35, 40 (D.D.C. 2010). "However, in civil cases '[t]he standard of review for interlocutory decisions differs from the standards applied to final judgments under Federal Rules of Civil Procedure 59(e) and 60(b).'" *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (quoting *Williams v. Savage*, 569 F. Supp. 2d 99, 108 (D.D.C. 2008)). "[R]econsideration of an interlocutory decision is available under the standard 'as justice requires.'" *Judicial Watch v. Dep't of Army*, 466 F. Supp. 2d 112, 123 (D.D.C. 2006) (citations omitted).

That standard asks whether reconsideration is warranted under the totality of the circumstances, including such factors as whether the court has patently misunderstood a party, has made a decision outside the adversarial issues presented to the court by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts has occurred since the submission of the issue to the court. *United States v. McCallum*, 885 F. Supp. 2d 105, 115 (D.D.C. 2012), aff'd, 721 F.3d 706 (D.C. Cir. 2013) (internal quotation marks and citation omitted). "Motions for reconsideration are committed to the sound discretion of the trial court." Judicial Watch, Inc. v. U.S. Dep't of Energy, 319 F. Supp. 2d 32, 34 (D.D.C. 2004) (citing Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). The moving party bears the burden "to show that reconsideration is appropriate and that harm or injustice would result if reconsideration were denied." *United States v. Hemingway*, 930 F. Supp. 2d 11, 13 (D.D.C. 2013). However, "a losing party may not use a . . . motion [for reconsideration] to raise new issues that could have been raised previously."

*Kattan by Thomas v. District of Columbia,* 995 F.2d 274, 276 (D.C. Cir. 1993). "'[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Hoffman v. District of Columbia*, 681 F. Supp. 86, 90 (D.D.C. 2010) (quoting Singh v. George Wash. Univ., 383 F. Supp. 2d 99, 101 (D.D.C. 2005)); see also *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995) (stating that a motion for reconsideration is "not simply an opportunity to reargue facts and theories upon which a court has already ruled").

*United States v. Trabelsi*, Criminal Action No. 06-89 (RWR), at *3-5 (D.D.C. Sep. 3, 2015).

## RELEEVEANT BACKGROUND

**The evidence**

Mr. Quaglin is incarcerated and has kept records to the best of his ability. This motion incorporates as exhibits numerous documents from the Jails, but more evidence is in the multiple Jails' possession and will require a Court order to obtain. Mr. Quaglin has no access to the forms and requests he submitted through electronic tablets or kiosks. Further, Mr. Quaglin only has access to forms that he filled out that provide a carbon copy. Informal request forms do not contain carbon copies, and Mr. Quaglin filled out many. Additionally, there are still thousands of documents in Mr. Quaglin's possession that need to be reviewed and then submitted as evidence. They are available upon request, or in the alternative, if necessary they may be supplemented in an ongoing manner. Mr. Quaglin would obviously prefer to be released so he can instead concentrate on his criminal case, which he has argued extensively that his pretrial detention has prevented him from doing.

**Habeas or civil proceedings**

Mr. Quaglin has been deprived his due process because he cannot file a habeas petition because whenever he does so, he is suddenly moved and his petition will be mooted, as it was when he filed in the past. At the hearing on March 14, the Marshal stated that to this day Mr.

Quaglin can be moved at any time.  Tr. 11:17-20.  So, Mr. Quaglin has no habeas corpus rights because he cannot sue the Jails as they can quick him out to another jail at any time, and he cannot sue the Federal government because the Court has decided that the federal government is not his primary custodian.  In the past, Mr. Quaglin covered all his bases by including both the Jail and the federal government, but the court dismissed the federal government immediately and then the jail transferred him while the petition was still pending as soon as they could no longer conceal damning evidence that related directly to Mr. Quaglin's case, namely that the warden, the final arbiter of the grievance process, was indeed unreasonable, as Mr. Quaglin alleged in his Petition, and that Northern Neck was not fit to hold state or federal prisoners, specifically January 6 prisoners, and most importantly, that Northern Neck concealed important information about the safety of its inmates from the authorities.

**Celiac disease**

Mr. Quaglin is being constantly transferred because the Jails cannot deal with his celiac disease and also because they are aware that he carefully documents his treatment with grievances and follows the procedures and exhausts his available remedies, which can expose the jails to civil liability for mistreatment and mishandling of his celiac disease.

**The grievance systems are irreparably broken**

The grievance systems in the prisons are irreparably broken.  Northern Neck was shown to be broken.  Ted Hull is the final authority of all grievances.  He has been proven to withhold evidence from Government authorities and both the State and Federal Governments have moved prisoners as a result.  In the DC Jail where Mr. Quaglin is currently detained, the Jail has 15 business days from receipt of an IGP, 15 days for step 2, 20 business days for a level 1 appeal, and 30 days for a level 2 appeal.  For a total of 80 business days, or over three months.  Further, there

is no penalty or recourse if the Jail takes even longer to return a grievance.  Mr. Quaglin was in

DC the first time from September 20, 2021 through November 9, 2021, which is 42 business days.

He got to step three and then was transferred.  The grievance process in Rappahannock is 54 days.

Mr. Quaglin arrived on December 23, 2022, and began filing grievances about his food right away.

Once again he got to step three after less than 40 days, and then was transferred on January 31,

2023.  He is now back in DC.  He arrived there February 1, 2023, and began filing grievances

immediately.  He is coming up to step three.  According to the pattern, he has every expectation

that he will be moved soon.

**Impact on Mr. Quaglin's criminal case**

The issue of Mr. Quaglin's confinement has been a distraction for Mr. Quaglin and his

attorneys.  Mr. Quaglin has had to spend considerable time documenting his mistreatment. He

spent time and resources having his lawyer go through these documents.  This was necessary for

his criminal case because it will have a substantial impact on his sentencing.  This required sifting

through thousands of documents and drafting briefs documenting for the record.

## MISREPRESENTATIONS AT THE MARCH 14, 2023 HEARING

There were many misrepresentations at the March 14, 2023 hearing, too many to

specifically address given the time constraints to file this motion.  Mr. Quaglin reserves the right

on appeal, at sentencing, or at any future proceeding, criminal or civil, to challenge the record

made at the hearing on March 14, 2023.

Significant facts that Mr. Quaglin seeks to establish in this motion are:

(1) Transfer from Rappahannock was not because he harassed medical staff. It was because he had legitimate grievances that subjected the Jail to civil liability which the Jail hoped to avoid by transferring Mr. Quaglin before he could exhaust his grievance remedies.

(2) Mr. Quaglin has a clean record in all Jails other than Northern Neck, and Mr. Quaglin has and the record contains significant evidence that these and any other incident reports were retaliatory. Accordingly, the Court cannot credit any disciplinary allegations against Mr. Quaglin unless and until Mr. Quaglin has a fair chance to properly dispute them, pursuant to his right to due process.

(3) Mr. Quaglin has not been able to view any discovery until very recently.

(4) Mr. Quaglin has been deprived of a gluten free diet for these last two years.

## I.     The Government's and the Marshal's representation that Mr. Quaglin was transferred from Rappahannock Jail because he "harassed medical staff" is demonstrably false, inconsistent with available evidence, and can be easily proven false by simply ordering the Government to produce documentation, which they cannot do.

Mr. Quaglin arrived at Rappahannock Regional Jail (RRJ) on December 23, 2022. That day he filled out a "Medical Request Form." Exhibit 3. The grievance forms were not available to him until January 2, 2023, because he was placed in the "hole" as soon as he arrived, for no reason, and remained there for over a week. Exhibit 4. In the Medical Request Form, Mr. Quaglin informed the Jail that he needs a gluten free diet, that he needs special medical shoes for his herniated disks in his lower back, and that he requires a second mattress for his lower back. Exhibit 3. To prove he had the double mattress at NNRJ, Mr. Quaglin kept with him a blue slip of paper showing that NNRJ had approved a second mattress, and he showed it to everyone involved. Exhibit 5. The Jail responded on December 28, 2022, five days later, stating "please be advised

there is no Gluten in the foods given in this facility and personal shoes not medically indicated."
Exhibit 3.  This response later proved to be false.

On January 2, 2023, as soon as the grievance system became available to him, Mr. Quaglin submitted a grievance explaining that a gluten free diet includes precautions to ensure there is no cross-contamination with gluten.  Exhibit 6.  He explained that he got sick twice from the grits. He mentioned that he speak with the rep from Aramark, the food distributor for other prisons, while he was at another jail and verified that the grits served at that prison were not 100% gluten free.  He wrote in prominent letters "I'm very sensitive to Gluten" at the top of the page.

Mr. Quaglin filed several more grievances, using paper forms and the electronic tablet.  On January 10, 2023, Mr. Quaglin submitted a step two grievance about his food situation stating, "All requests and grievances have been neglected/not answered regarding kitchen and printouts." Exhibit 7.   Mr. Quaglin requested but was never granted access to the "printouts" of his electronically filed grievances.  Mr. Quaglin filed many grievances, including but not limited to on January 12, 14, and 24.  Exhibits 8, 9, 10 ("I keep getting food that is not gluten free even though it is marked [by the jail] as gluten free.  I need a list of certified gluten free foods from summit foods/the kitchen.  PLEASE HELP!")  Mr. Quaglin made multiple requests on tablet and by paper asking for 100% certified gluten free food and a list provided by RRJ and the Jail's food distributor, Summit Foods, of certified 100% gluten free products available.  His "gluten free" trays contained processed foods that were most likely not certified gluten free and were making Mr. Quaglin sick.

His grievances were ignored until finally, on January 21, 2023, Mr. Quaglin sent a grievance stating, "I was unable to eat breakfast today. (Twice [I could not eat the first tray because it had gluten.  The Jail brought another tray and I could not eat that one either for the same reason.])

Please check with Distributer and check Gluten Free trays.  * Can I please have a list of Certified Gluten Free foods provided? * Sausage – bound with wheat (most likely), cake/bread – not gluten free.  Grits – processed with wheat (got sick from it several times).  Potatoes – possible cross contaminated (please check with distributer)."  Exhibit 11.

Finally, after almost a month in Jail and numerous requests to be connected with the food distributor, Mr. Quaglin received a response from the distributor for the first time and the distributor apologize for not giving him gluten free food.  The grievance response came directly from "Summit Food Services" not from the Jail staff.  "I do apologize about this and I will make sure I take right action and speak with my teal wo this will not happen again and unfortunately we can not provide you with a list as are [sic] menu changes every day."  Exhibit 11.

This shows conclusively what Mr. Quaglin has been arguing all along, namely, the Jails are not properly trained to certify trays as 100% gluten free for inmates like Mr. Quaglin with celiac disease who are severely sensitive to gluten cross-contamination.  Such training includes following certain procedures during preparation and ensuring that all processed products are certified 100% gluten free.

The Court has compared Mr. Quaglin's condition to a religious preference, *see* Tr. of Hr'g, 16:18-21.  This is not a correct comparison.  Unlike a religious preference, Mr. Quaglin gets physically sick when he eats food contaminated by gluten.  Unlike the distributor who understood that Mr. Quaglin required only gluten free certified products, the Jail incorrectly assumed that it was sufficient to serve Mr. Quaglin a form of "Kosher-style" gluten free diet, i.e., foods that the Jail in its own estimation considered to be gluten free, like vegetables, without considering if those foods were cross-contaminated and would trigger Mr. Quaglin's allergies.  As will be set forth below, Mr. Quaglin recently obtained new evidence that this was a problem at other Jails as well.

It is well documented, therefore, that Mr. Quaglin made it clear that he needed a gluten free diet the day he arrived at RRJ.  The prison, either in good or bad faith, falsely informed him that the food was gluten free on December 28, 2023.  But Mr. Quaglin continued to get sick form the food, and reasonably requested that the Jail check with the food distributor.  When they finally did, it turned out Mr. Quaglin was right all along.  There was no reason this could not have been done on December 23, 2023, when Mr. Quaglin arrived at the Jail.  But for reasons unknown, the Jail failed to pass this along to the food services until Mr. Quaglin had already been in jail for an entire month.  They finally were informed, and apologized to Mr. Quaglin, and on January 25, committed to trying to get his diet right.  Mr. Quaglin was transferred 6 days later.

The Government and the Marshals claim that Mr. Quaglin was moved because he "harassed" medical staff.  This is a lie and should be stricken from the record.  There is no evidence supporting this allegation.  There is no record of any disciplinary action being taken against Mr. Quaglin.  There is no incident report.  There is ample evidence that Mr. Quaglin had serious medical issues, besides the fact that the Jail could not provide him with gluten free food, and he was denied his repeated requests to see a doctor.  When he finally saw a doctor, it was for less than five minutes, all of Mr. Quaglin's requests were denied, and Mr. Quaglin was sent on his way without incident.  He was transferred days later.

On January 6, 2023, Mr. Quaglin submitted a medical request form.  "I need to see the Dr. ASAP Please.  I have several issues that were ignored for a year because of medical staff at previous location.  I have back issues, coeliac disease (severe), shoulder issues, GI issues, and dental that needs to be addressed. These are preexisting issues from other Jails.  Need Help ASAP. Please accept medical shoes immediately. Arriving 1-9-23.  Health neglected for a year." Exhibit 12.

On January 9, 2023, Mr. Quaglin saw medical staff for the first time.  He saw a man named "Kobe."  Mr. Quaglin asked Kobe if he was a doctor or a nurse.  Kobe would not answer and instead just said, "call me Kobe."  Mr. Quaglin saw Kobe for less than five minutes that day, and never again.  Mr. Quaglin has carefully chronicled every day of his experience in Jail and has detailed notes of his meeting with Kobe.  Exhibit 13.  Kobe denied all of Mr. Quaglin's medical requests, including his request to see a doctor.  *Id.*  Mr. Quaglin's January 6 grievance asking to see a doctor was responded with "You were seen at nurses sick call on 1/9/23."  Exhibit 12. Conspicuously, the response does not say that he "harassed" the nurse. It does not even say that he was seen by a nurse, only that he was seen at "nurses sick call."  That day, Mr. Quaglin submitted a grievances referencing his meeting with Kobe, and the Jail responded without any reference to any harassment.  Exhibit 14.  The next day, on January 10, 2023, Mr. Quaglin requested an appointment with "Dr. Johnson," and on January 12, the Jail denied his request, saying "we do not just schedule you to see a Dr."  Exhibit 15.  After his meeting with Kobe, Mr. Quaglin submitted numerous requests to see a doctor.  *E.g.*, Exhibit 16.  Finally, on January 26, 2023, Mr. Quaglin saw Dr. Johnson, and Mr. Quaglin took notes documenting the meeting.  Exhibit 17.  The meeting was about 3 minutes long and there was no harassment.  No discipline report was written up by the Jail.  Mr. Quaglin asked for the Doctor to put something in writing and the doctor refused to do so.  The doctor denied all his requests and denied him medical care.  Mr. Quaglin was sent on his way without incident.

The 3-minute meeting with Doctor Johnson and the 3 minute meeting with Kobe were the only times that Mr. Quaglin saw medical staff while at Rappahannock.  There is no evidence that he harassed either Kobe or Dr. Johnson or any other medical staff.  On the contrary, there is substantial evidence, and more can easily be obtained through discovery or a court order, that Mr.

Quaglin was requesting medical care and was being denied medical care.  Rappahannock has a history of being sued for the same reason.[1]

On January 31, 2023, before Mr. Quaglin's many grievances reached the final stages of exhaustion, Mr. Quaglin was transferred to DC Jail.

Someone misrepresented to the court that the reason for the transfer was because he "harassed medical staff."  The Jail, the marshals, and the government all made this representation.  The Court sent an email to the Government on February 10, 2023, asking for the reason for the transfer.  The Government was given two weeks to respond and provided only a vague and conclusory allegation – but a serious allegation that could have severe repercussions for Mr. Quaglin's sentencing.  ECF No. 545.  Mr. Quaglin responded that the Government flouted the Court's request by not performing a proper inquiry.  ECF No. 546.  The Government was permitted at the hearing on March 14, 2023 to present evidence not briefed in advance with no notice to Mr. Quaglin by introducing Marshal Brown.  Mr. Brown was not called as a witness, he was not put under oath, and Mr. Quaglin was not given an opportunity to cross examine Marshal Brown.  Mr. Quaglin was forced to spend hours with his lawyer after the hearing to sift through thousands of documents from his pretrial detention to find his Rappahannock documents, and then through hundreds of documents from Rappahannock to respond to the Government's allegation.  The Court now has enough evidence on the record to discredit the Government's representation as to the reason for Mr. Quaglin's transfer.  Further, the Court now has enough evidence on the record to credit  Mr. Quaglin's  testimony  that  he  was  mistreated,  and  his  rights  were  violated  in

---

[1] See, e.g., Advocates, families seek more measures to prevent jail suicides (fredericksburg.com),       https://fredericksburg.com/news/local/advocates-families-seek-more-measures-to-prevent-jail-suicides/article_a4b2369c-5eb0-11ed-ab68-bf866efd4eaa.html ("Records show that Michael [Hall] asked to see a mental health provider at least twice in the month before he died.").

Rappahannock.  This should suffice to reconsider the Court's order to release Mr. Quaglin and let him go home so he can prepare for trial.

II.     **The Court's suggestion that Mr. Quaglin is responsible for the "pattern" of transfers because he has been a disciplinary problem for the Jails is unsupported by admissible evidence, and easily disputed, but Mr. Quaglin has not been given a fair chance to do so.**

The Court stated that it credited the Government and the Marshal's claim – without evidence – that Mr. Quaglin was transferred because he "harassed medical staff."  The Court went on to say, "frankly, it's part of a pattern here with this defendant."  The Court cited his oral ruling from Mr. Quaglin's habeas petition citing "numerous incident reports before me detailing Mr. Quaglin's, quote, 'aggressive and obstructive behavior toward jail staff,' closed quote."

These statements suggest that Mr. Quaglin has been a disciplinary problem during his pretrial detention, however, this is disputed and should not be considered by the Court unless Mr. Quaglin is given a fair chance to litigate these allegations against him.

Mr. Quaglin has been in nine different facilities: (1) Essex, NJ, (2) FTC Oklahoma, (3) DC Jail, CTF, (4) Lewisburg, (5) Alexandria, (6) Northern Neck, (7) Rappahannock, (8) DC Jail CDF, (9) DC Jail CTF (round 2).  Until Mr. Quaglin arrived at Northern Neck, he had zero disciplinary problems, and as stated above, he had none at Rappahannock.  This is not by any means a "pattern" of behavior on Mr. Quaglin's part.  If anything, the fact that he has been moved seven times without any incident reports shows a "pattern" by the Government.  The Court can easily confirm that Mr. Quaglin had no discipline reports at other prisons by ordering discovery for all prisons.  Especially given the Jail, the Marshals, and the Government's representations that suggested that Mr. Quaglin had disciplinary problems at Rappahannock when the evidence shows that he did not, should make the Court skeptical of all allegations against Mr. Quaglin.

This statement must be clarified for the record because it has serious repercussions not only for Mr. Quaglin's motion for release, but for his sentencing, and for all proceedings going forward, criminal or civil.

Regarding the allegations of disciplinary problems at Northern Neck that the Court credits: First, the evidence presented by Northern Neck at the habeas petition should not be considered because Mr. Quaglin did not have a fair opportunity to litigate. Northern Neck presented hundreds of pages of documents with its Answer to Mr. Quaglin's habeas petition. The Court effectively filed a motion to dismiss the habeas petition on the Jail's behalf when it decided sui sponte to construe the Jail's Answer as a Motion to Dismiss. When Mr. Quaglin responded by pointing out that a Motion to Dismiss that disputes material facts in the complaint must be denied, the Court admitted that it was a mistake, Tr. of Habeas Petition, 4:2-4, but then effectively filed a Motion for Summary Judgment on behalf of the Jail. Mr. Quaglin responded by pointing out that the Answer failed as a motion for summary judgment also, because, inter alia, it contained a multitude of disputed material facts, including disciplinary reports about Mr. Quaglin which contained inadmissible hearsay. Further, the Court gave Mr. Quaglin only 10 days to respond to the summary judgment motion, which contained hundreds of pages of documents. Further, Mr. Quaglin was in solitary confinement in Northern Neck during the time to respond and it was impossible for his attorneys to speak with him or review the evidence. The Court stated that it was Mr. Quaglin's fault that the Court shortened the time from 28 days to 10 days to respond to the motion to summary judgment, because Mr. Quaglin filed a motion for release in the criminal case while the motion for summary judgment was pending in the civil case. But Mr. Quaglin never asked for less time to file a response. At the hearing, the Court credited all the Jail's evidence and did not consider any

of Mr. Quaglin's evidence which was submitted with his Petition.  Habeas Petition, 1:21-cv-1154, ECF 6.

The Court granted summary judgment at the hearing on the habeas petition on September 29, 2022, but Mr. Quaglin filed a timely motion to alter and amend.  The Motion to Alter and Amend was based on the procedural irregularities and based on new evidence, namely, it was discovered while the petition was pending that the State of Virginia found that Northern Neck was not fit to house state inmates, and the Federal Government subsequently found the same and removed all January 6 defendants, including Mr. Quaglin, from Northern Neck.  This mooted the habeas petition before Mr. Quaglin had a fair opportunity to dispute the Jail's evidence.  This should preclude all "evidence" considered by the Court in the Summary Judgment motion in the civil case because Mr. Quaglin did not have a fair opportunity to dispute it.  It should further be noted, that the Court had an opportunity to open discovery to get to the bottom of what happened at Northern Neck to January 6 defendants when one of Mr. Quaglin's codefendants asked for discovery on why January 6 defendants were transferred from Northern Neck, but the Court denied the motion.  ECF No. 560.

Further, Mr. Quaglin has new evidence, in the form of a declaration of Geoffrey Sills, that Northern Neck did not take any precautions to ensure that Mr. Quaglin's food was not crossed contaminated.  *See* Exhibit 18, Sills Declaration.

There are no other allegations on the record of substantiated, undisputed, and fairly litigated disciplinary violations.  Should the Government present any to the Court, Mr. Quaglin expects that he will have a fair opportunity to dispute them.  In sum, there is no evidence of a "pattern" of discipline problems with Mr. Quaglin.  To establish such a "pattern," the Government should have to bring evidence, which it has not.  Mr. Quaglin, therefore, requests that any suggestion of such

be stricken from the record and that the Government and the Court should be precluded from incorporating any suggestions in his bench trial, at sentencing, or at any future proceeding, criminal or civil.

### III.    Mr. Quaglin has been in Jail for 2 years and through no fault of his own, has not had adequate access to his discovery until March of 2023.

The Court states that Mr. Quaglin's statements were "inconsistent" because he stated that he was not able to view his discovery, "but in the same motion, he states that he was given a table at the D.C. Jail." Tr. of Hr'g, 28-29.  These statements were not inconsistent.  The tablet does not provide Mr. Quaglin any means to view his discovery.  Mr. Quaglin needs two things to access his discovery, (1) a means to view the contents of the hard drive provided by his attorney, and (2) a means to access the Government databases evidence.com and relativity.com with 14,000 hours of video evidence.  The tablet provides Mr. Quaglin with neither.  He cannot view the contents of his hard drive, and he cannot view the databases.

The Court stated, "It sounds to me like the D.C. Jail has an appropriate flash drive or has the appropriate flash drive that the defense has provided and that the Defendant is allowed to use a tablet in accordance with Jail procedures." Tr. 30:7-10.  It is true that Mr. Quaglin has a hard drive, not a flash drive, with his discovery.  But the distinction between hard drive and flash drive is important because it goes to the amount of discovery.  The amount of discovery – just for this particular case, not including the 44,000 hours of footage – exceeds the storage limits of small 64 gigabyte flash drives.  This is significant because it goes to what is considered a fair amount of time to view his individual discovery alone – not including the 44,000 hours.

The point that needs to be corrected or clarified for the record is that the Government has not disputed that Mr. Quaglin was deprived the opportunity to see the discovery on his hard drives for almost two years, and has not presented any evidence or testimony to suggest otherwise.  He

was given a hard drive by attorney Carlos Diaz in Essex which the Government lost before Mr.
Quaglin could view its contents when Mr. Quaglin was transferred to DC. This is not disputed by
the Government and is well documented by Mr. Quaglin. He was then given a second hard drive
by attorney Joseph McBride at the DC Jail, which the Government also lost before Mr. Quaglin
had an opportunity to view it. This is also not disputed by the Government, and is well documented
by Mr. Quaglin. Then Mr. Quaglin filed a habeas petition against the Government and against
Northern Neck Jail alleging that he had been deprived access to his hard drive. The case was
mooted because he was transferred again. In Rappahannock, attorney Gross promptly delivered a
hard drive to Mr. Quaglin which arrived on January 1, 2023, but the Jail did not provide it to Mr.
Quaglin until almost three weeks later. Then Mr. Quaglin was transferred days later to the DC
Jail, and the Government lost his hard drive again.

Mr. Gross attempted to deliver a hard drive with Mr. Quaglin's discovery on February 16,
2023, and then again on February 22, 2023, but was denied by the Jail. ECF No. 536. Mr. Gross
reported to the Court in a supplement brief that he was finally able to deliver the hard drive to Mr.
Quaglin on February 28, 2023. ECF No. 547. But Mr. Gross stated that he was unable to confirm
whether Mr. Quaglin was able to access the hard drive because he was under lock down. Mr.
Quaglin was eventually given access to a laptop to view his discovery, but since, the laptop has
been taken away from him and given to another inmate and he must wait an indefinite and
undetermined amount of time until he can access his hard drive again.

In sum, in two years, Mr. Quaglin has had only a few weeks to view his discovery that is
too voluminous to fit onto a flash drive. This is not in dispute by the Government, and is well
documented on the record and in documentation in the possession of the Jails and Mr. Quaglin.
Mr. Quaglin has consistently argued that his inability to view his discovery has prejudiced him.

Regarding the 44,000 hours, Mr. Quaglin has still had no access to any of it. The Government places the blame on Mr. Quaglin by claiming that he never filled out the protective order. This is an unsubstantiated and irrelevant red herring. Mr. Quaglin signed the protective order twice before the hearing on March 14, 2023 – once when presented by his first attorney Carlos Diaz, and a second time when presented by his second attorney Joseph McBride. He signed it a third time when presented with it by the Government at the hearing on March 14, 2023, but since then he has still not been granted access.

In any event, Mr. Quaglin was in nine different facilities and was never given an opportunity to see the evidence in any form – even if he had signed the protective order. This is not disputed, and easily confirmed. It is well established and not in dispute that in Northern Neck and Rappahannock, where Mr. Quaglin spent all of 2022, there is no access to the 44,000 hours of footage. Further, it is not in dispute that he was never given an opportunity to view a laptop in DC during his first time there, or that he did not have access to the 44,000 hours in any of the other prisons – with or without signing the protective order. The Court only disputes that for the month and a half in DC from February 1, through March 14, it was Mr. Quaglin's fault because he had not signed the protective order. But even after he signed the protective order, Mr. Quaglin has still not been given access to the databases.

The Court held that Mr. Quaglin waived his right to access the databases with the 14,000 hours that the Government has released when he hired an attorney to represent him and did not address the additional 30,000 hours that were only released to Tucker Carlson. Mr. Quaglin maintains that he does have a right to see the discovery and will bring that up on appeal. However, for now, Mr. Quaglin seeks to clarify for the record that he has only had the ability to see his discovery on his hard drive for a short time in Rappahannock and for a short time in the DC Jail,

and through no fault of his own, but because the Government repeatedly lost his discovery while transferring him, or else the Jail held his discovery without providing him access.  Also, Mr. Quaglin has still to this day never been provided with a means of viewing the video evidence on evidence.com or relativity.com or the 30,000 hours withheld by the Government.

**IV.    The Jails have not been able to provide Mr. Quaglin with a gluten free meal in almost 2 years.**

First, it is important to correct for the record that Mr. Quaglin's celiac disease is not a lifestyle preference.  This has never been in dispute, however, at the hearing on March 14, 2023, the Court compared Mr. Quaglin's celiac disease to a religious diet.  For the record, Mr. Quaglin would like to clarify that celiac disease, which he has lived with since he was a child, is a serious medical condition.  This is not a religious diet; it is a confirmed medical condition.  Mr. Quaglin has expressed in several declarations that he has lived with celiac disease since he was a child.  It requires strict adherence to a 100% gluten free diet.  Mr. Quaglin is extremely sensitive.  Any cross contamination can have severe impact on his health.  This has never been in dispute.

The Government, the Marshal, and the Jails all claim that he was given "gluten free food," but Mr. Quaglin has consistently communicated that because of the severity of his allergy, the Jail must not only be careful to give him foods that are inherently gluten free, but that the food must be prepared in a way where gluten does not contaminate his food through contact, and that all products must contain on the label the symbol certifying that the product is 100% gluten free.  The Jails are not trained to prepare food for someone with Mr. Quaglin's allergy, and they refused to listen to Mr. Quaglin.

Also, there have been many days when Mr. Quaglin has been fed pure gluten, showing that he is not on a special gluten free diet.  The day that Marshal Brown told the Court that Mr. Quaglin

was on a gluten free diet, Mr. Quaglin's lunch was a sandwich on regular bread with a bag of regular cookies.

Further, Mr. Quaglin has extensive documentary evidence of grievances at the DC Jail since February 1, 2023, that he has been consistently fed foods that contain gluten.  *See, e.g.,* Exhibit 19.

This has been a problem at DC since the first time Mr. Quaglin was there.  Mr. Quaglin began a grievance about his lack of gluten free food in October of 2021, just after he arrived there for the first time.  Mr. Quaglin escalated his grievance to s step 2 on November 4, 2021.  Exhibit 20.  As an emergency, it should have been responded to in 72 hours.  Mr. Quaglin escalated his emergency to step 3 on November 6, 2021.  At that time, Congresswoman Marjorie Taylor Greene brought attention to the situation at the DC Jail for January 6 defendants, and mentioned Mr. Quaglin by name and his celiac disease.  Also at about that time, the Jail was held in contempt by this Court.  On November 9, at 4 am, Mr. Quaglin was suddenly transferred, for reasons unknown to this day.  On November 11, 2021, after Mr. Quaglin was already gone, the jail responded, "we are making sure all staff is following the diet needs for all residents."  And on December 1, 2021, the jail responded to step 2 stating "All guidelines for your diet has been followed."  Mr. Quaglin only received these documents in the jail's latest document production.

Mr. Quaglin has extensive evidence documenting his treatment at the DC Jail that he has not had a chance to review with his attorney.  But the evidence provided should be enough to correct the record that the DC Jail has not had Mr. Quaglin on a strictly gluten free diet since he arrived, as the Government and the Marshals presented at the hearing on March 14, 2023.

**CONCLUSION**

Mr. Quaglin would like the Court to correct the record by issuing an order striking the Government and the marshals representations in their entirety from the March 14, 2023 hearing, and reversing the Court's order and grant Mr. Quaglin's Third Motion for Release so that he can stop litigating his conditions of confinement and instead go home to the custody of his wife Moira so that he can prepare for his criminal trial.

Dated: April 5, 2023                    Respectfully submitted,

                                        /s/ Jonathan Gross
                                        Jonathan Gross
                                        Bar Id: MD0162
                                        THE CLEVENGER FIRM
                                        2833 Smith Ave, Suite 331
                                        Baltimore, MD 21209
                                        (443) 813-0141
                                        jon@clevengerfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing is being served on opposing counsel via email on

April 5, 2023.

/s/ Jonathan Gross