**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-40-4 (TNM)** |
| **CHRISTOPHER JOSEPH QUAGLIN,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

As this Court knows from presiding over a stipulated trial in this case and from presiding over dozens of other January 6 cases, defendant Christopher Joseph Quaglin was among the most violent of the January 6 rioters. He viciously assaulted numerous officers, and this Court convicted him of six counts of assault, two counts of robbery, obstruction of the Congressional certification vote, and other offenses. For the reasons set forth herein, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, recommends that this Court sentence Quaglin to 168 months of incarceration, the bottom end of the range calculated by the government, three years of supervised release, $2,000 in restitution, an $82,000 fine, and a mandatory $1,220 special assessment. This sentence is warranted because the stipulated evidence proved that Quaglin engaged in numerous assaults and other aggressive acts against police and property.

## I.    INTRODUCTION

For over three hours, Christopher Quaglin participated in a violent assault on the United States Capitol, which forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more

1

than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Quaglin understood the constitutional significance of January 6, and intended to disrupt Congress' certification of the 2020 election by any means necessary, including by viciously assaulting police officers for hours. Quaglin started planning this violence well before January 6. In the months before, he took to social media and repeatedly called for "Civil War"; meticulously planned the weapons and protective gear that he would bring; invited others and encouraged people to attend by booking blocks of hotel rooms; boasted on social media that the armed patriots would storm the Capitol; and made countless social media posts about his intent of stopping the certification to ensure the former president would remain in power.

On the 6th, Quaglin attended some of the "Stop the Steal" rally but left early for his intended objective: storming the Capitol. Quaglin was with the first group of rioters that stormed the barricades near Peace Circle. Once the mob overran several lines of bike racks and police officers and flooded the West Plaza, Quaglin marched up and down the police line and assaulted police officers for nearly an hour-and-a-half. On at least a dozen occasions, Quaglin stood face-to-face with officers as he screamed at, pushed with outstretched arms, punched, swatted, and slapped officers; pushed bike racks into officers; and even choked one officer to the ground. Quaglin tore down permanent barriers on the West Front during his tirade. And not long after

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Quaglin aided other rioters in wrestling away a bike rack from the police line, the mob finally overwhelmed the officers, leading to a general retreat. As officers tried to escape the area using a temporary staircase, Quaglin followed, cornering the officers and continuing his attack. Quaglin then followed the officers to the Lower West Terrace tunnel where he joined the onslaught against the police line. Quaglin used his body as a battering ram and employed a stolen police riot shield against the officers in attempt to force his way into the building. He also joined another rioter in disarming a police officer of a shield and passing it back to other rioters. Quaglin sprayed several officers directly in the face with chemical irritant. And he joined the collective mob pushes against the police line. In total, Quaglin was on Capitol grounds – *wreaking havoc* – for more than three hours.

Since January 6, Quaglin has expressed no remorse for his crimes. Instead, he has sought attention and disclaimed any responsibility for his role in the riot. Even after his convictions, Quaglin has regularly joined public shows and podcasts to boast about his involvement in the Capitol riot, to blame others for the resulting harms of the day, to spread misinformation claiming that January 6 was a "set up," to declare himself a political prisoner, and to denounce his guilt.

For his actions, Quaglin was convicted of twelve felonies—including three counts of assault using a deadly or dangerous weapon, three counts of assault, two counts of robbery, civil disorder, obstruction of an official proceeding, engaging in physical violence with a dangerous weapon, and disorderly and disruptive conduct with a dangerous weapon—and two misdemeanors. Due to his egregious criminal conduct on January 6, his refusal to accept responsibility, and the need to deter him and others from further wrongdoing, the government recommends that the Court sentence Quaglin to 168 months of incarceration, at the bottom end of the advisory Guidelines'

range of 168-210 months, which the government submits is the correct Guidelines calculation.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 674, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Christopher Quaglin's Role in the January 6, 2021 Attack on the Capitol

#### *Pre-January 6 Conduct*

Following the 2020 presidential election, Quaglin regularly discussed his belief that the election was fraught with fraud and that the election was "stolen." *See, e.g.*, Ex.[2] 1 at 2 ("they stole like 4 states"); *id.* at 4 ("And its obvious they cheated"); *id.* at 7, 9, 13, 36 ("They literally rigged an election."). As such, Quaglin planned to travel to Washington, D.C. for January 6, a date when he understood "the House and Senate will come into a joint session to open the votes" and when he believed "Vice President Mike Pence will have all the authority as president of the Senate for that day and will accept or reject motions to decide the next steps by the assembly." *Id.* at 27 (also discussing the votes, objections, and exposing fraud on January 6 during the joint session).

Quaglin posted on social media that he was going to "fight back" against the "voter fraud," *id.* at 5, and he discussed the "fighting" in terms of war. He posted on social media, for example, in relation to January 6, that he was "going to war" and warned that he "might not even make it

---

[2] References to Exhibits ("Ex.") in this Memorandum refer to the Government's Exhibit List in Support of Sentencing Memorandum, which will be provided to the Court along with the exhibits referenced herein.

back." *Id.* at 6, 10, 15 (referencing a "civil WAR"). Quaglin planned to wear "[f]ull body armor,"[3] *id.* at 10, 114, and bring "gas masks, body armor, and other things," *id.* at 73, including "a full medical kit," *id.* at 131; *id.* at 120 (gas masks); *id.* at 132 ("I will have body armor. And the knife size limit is 3". Fyi"); *see* Ex. 5 (box for gas mask).

 

*Images 1-2: Photograph of gas mask, left, that Quaglin posted on social media in reference to bringing to D.C.; and photograph, right, showing a picture Quaglin referenced on social media, following a message to another Facebook user where Quaglin encouraged the person to travel to D.C. for January 6*

Quaglin warned that the "militia" would have to appear in "FULL FUCKING GEAR" with full body armor, and he anticipated that the group would be "hit with pepper spray and beer [sic] spray." *Id.* at 114; *id.* at 132 ("Ill have bear spray (The gel stuff that shoots 30 feet) and the big can"); *id.* at 90-91 (Quaglin warning others to buy a gas mask with a filter "good for pepper spray."). And when another social media user asked Quaglin if he thought the situation would turn into a civil war, Quaglin replied, "I'm bringing my guns." *Id.* at 114; *see also id.* at 125 ("Be a

---

[3] During his planning for January 6, Quaglin maintained that he planned to wear body armor in Washington, D.C. Although he wore an over-sized sweatshirt as his outer layer on January 6 and thus no body armor is visible, in numerous videos and photographs from that day, Quaglin appears to have been wearing something under his sweatshirt that was rigid. *See* Ex. 62.

patriot. I'm going armed."); *id.* at 132 ("Body armor immediately increases any charge to a felony fyi. And if you get caught with a firearm you're fucked"); *id.* at 133 (discussing bringing bear spray, knives, and firearms); *id.* at 90-91 (Quaglin warning others to buy a gas mask with a filter "good for pepper spray."). Quaglin said that he had been "planning for this since fucking Bush left office and obama came in," and sent a photo of his "gun wall,"[4] with the following message that said, "Who wants to go to dc? I have an extra double twin bed available":



*Image 3: Photograph Quaglin shared on social media following his messages regarding planning for January 6*

Quaglin repeatedly told others that he purchased "3 cans of bear spray – huge cans And [g]as masks" for January 6. *Id.* at 100; *id.* at 112; *id.* at 102 ("I got something for their ass. Get some bear sprey [sic]. 3 bottles"); *id.* at 110 (offering to secure big cans of bear spray for another person traveling to Washington, D.C.). Quaglin prepared for what he expected to be a violent day.

---

[4] On the day that Quaglin was arrested, all of the items hanging on this wall had been removed.

He explained in messages that his "wife was crying" about him going to D.C., *id.* at 105, but Quaglin nevertheless believed the trip to be worthy, because it was "the beginning of a revolution," *id.* at 132.

As Quaglin continued to discuss his plans for traveling to Washington, D.C., he stated that he was going to be "front fucking line" in the "war I'll be fighting" – "FUCKING WAR." *Id.* at 17, 18 ("Looking forward to a war"); *id.* at 73 ("This is going to spark a war"). And the target remained clear: Quaglin encouraged others on social media to "pick up arms and storm the capital," *id.* at 33, and he repeatedly referred to January 6 as "1776 2.0," *id.* at 39-40, 70 ("Its popping.off. its gonna be 1776"), *id.* at 72, *id.* at 83 ("there are gonna be 1000 militia in ar15 marching in the streets"), *id.* at 89, *id.* at 115 ("Is gonna be over 1000 militia there armed with AR15"). Quaglin stated that "war is coming" because it's "[t]ime for the government to understand who the fuck they work for." *Id.* at 92, 116 ("lets please PLEASE celebrate Christmas and new years before we have a Civil War.")

In addition to encouraging others to attend, storm the Capitol, and bring weapons, Quaglin attempted to facilitate travel plans for others, offering various people a spare hotel bed, *id.* at 61, and booking a block of rooms for others, *id.* at 67-68, 75-76, 88, 96, 137, 138. Quaglin also offered body armor and gas masks for those who traveled to the Capitol. *Id.* at 74.

### Quaglin's Participation in the Capitol Riot

On January 6, after leaving the "Stop the Steal" rally early, Quaglin marched towards the Capitol building and posted to social media a video of himself saying, "Trump is speakin' and everyone's walking there. I'm walking here." Quaglin turned the camera to his gas mask and said, "I AM READY! We will see how it goes. PROUD OF YOUR BOY!" Ex. 11 at :00-:33.



*Images 4-6: Screenshots of video footage recorded by Quaglin showing his march to the Capitol in gear, including a gas mask and helmet (Ex. 11 at :00-:33)*

Quaglin arrived fully equipped. He wore a black helmet, gas mask, and backpack. He wore an oversized sweatshirt with something under the sweatshirt that appeared to be rigid.



*Image 7: Photograph showing Quaglin (yellow square) marching towards the Capitol wearing and carrying his gear*

Quaglin arrived at the outer perimeter of Capitol grounds before the barriers had been breached. At approximately 12:45 p.m., as preparations for the Congressional proceedings were

underway in the House and the Senate, Quaglin and a large crowd gathered to the West of the U.S. Capitol around Peace Circle. The crowd moved southwest to the threshold of the sidewalk that connects Peace Circle to the U.S. Capitol Building, commonly referred to as the "Pennsylvania Avenue Walkway."

At about 12:50 p.m., Quaglin and other rioters bypassed the first line of metal barricades that were erected to keep the public away from the building. The crowd approached a second line of barricades that were manned by uniformed U.S. Capitol Police (USCP) Officers. The second line of barricades were constructed of metal bike rack barriers, physically linked end to end, and reinforced with dark colored plastic mesh safety fencing affixed behind the metal bike racks. The fence was clearly marked with large, white "AREA CLOSED" sign with bold red lettering. Upon approaching the barricade manned by USCP Officers, the crowd immediately became confrontational with the officers. Rioters pushed and pulled on the barricades as the now vastly outnumbered officers attempted to keep the crowd back. Quaglin watched as rioters plowed through the bike rack barriers, knocking over police officers, and storming forward.



*Images 8-9: Screenshot of video recorded by Quaglin and shared on his social media page showing the barriers being trampled over, left, and photograph showing Quaglin as he approached the Capitol grounds with the first group of rioters and trampled over bike rack barriers, right (see Ex. 12)*

Quaglin and other rioters surged forward through the barriers. As the rioters moved down the Pennsylvania Avenue Walkway, they approached a third line of barricades backed by another line of police officers. Quaglin marched directly to the front of the barricades. Officers directed rioters to stay back but moments later the rioters surged through the metal bike racks and flooded the Lower West Plaza. Quaglin was at the front of the crowd.



*Images 10-11: Screenshots of third-party footage showing Quaglin (yellow square) at the front of the mob, left, pointing towards the Capitol, right, just before the mob plowed through the third line of bike rack barriers (Ex.56)*

10

By 12:59 p.m., just after the rioters gained access to the West Front, Quaglin made it to the front of the crowd. Ex. 14 at 12:59:33 p.m. For the next hour-and-a-half, Quaglin worked his way through the mob of rioters and repeatedly attacked police officers. *E.g.*, Ex. 14.



*Image 12: Screenshot of Capitol Police Surveillance Footage (Ex. 14) showing Quaglin (yellow square) at the front of the mob where he remained for the next hour-and-a-half*

Almost immediately after gaining access to the West Plaza, Quaglin became aggressive towards USCP officers. At 12:59:41 p.m., Quaglin stepped forward face-to-face with a police officer and aggressively pointed and yelled at the officer. Ex. 14 at 12:59:41 p.m.

Shortly after 1:00 p.m., Quaglin stepped forward and physically pushed into an officer and continued aggressively pointing and yelling at the officer as Quaglin stood inches away from the officer's face. *Id.* at 1:00:14-1:00:34 p.m. After stepping back to resecure his helmet, Quaglin yelled at police officers, talked to others in the crowd, emphatically waved his arms, and pointed at the Capitol building. Then, at about 1:06 p.m., Quaglin emerged from the crowd and charged

towards the officers. With his arms outstretched, Quaglin forcefully shoved a police officer. Ex. 15 at :08.



*Image 13: Screenshot of Capitol Police Surveillance footage showing Quaglin (yellow square) forcefully shoving a police officer (Ex. 15 at :08)*

A few seconds later, Quaglin reached towards a different police officer and swatted him several times. Ex. 15 at :08–:26.



*Images 14-15: Screenshots of Capitol Police Surveillance footage showing Quaglin (yellow square) pushing a police officer, left, and swatting a different police officer, right (Exs. 15, 15.1, 15.2)*

At about 1:06:50 p.m., Quaglin approached another officer and repeatedly poked the officer

in the chest with his finger and yelled at the officer. Ex. 16 at 1:56. Quaglin aggressively gestured

his arms and pointed at the Capitol building several times.



*Images 16-17: Screenshots of Capitol Police Surveillance footage, left, and open-source footage,*
*right, showing Quaglin (yellow square) aggressively pointing at a police officer*

Then, as Quaglin walked past the line of officers, he charged forward. He pushed an officer

and swatted at another officer numerous times. Ex. 15 at 2:20.

**Count One (Assault of Unidentified Officers):**   At about 1:08 p.m., Quaglin pushed into

one officer and forcibly pushed into a second officer several times. Quaglin swatted and appeared

to aggressively yell at the officer until another individual from the crowd pulled him back. Ex. 17

at :00-:15; Ex. 14 at 1:08:10-1:08:37 p.m.



*Image 18: Screenshot of Capitol Police Surveillance footage showing Quaglin (yellow square)*
*pushing a police officer with both hands (Ex. 17 at :10, Ex. 17.1; Ex. 15 at 1:59, 2:20-2:31)*

13

**Count Two (Assault of Sergeant Troy Robinson) and related conduct:** Quaglin maneuvered through the mob of rioters facing the police line. At about 1:11 p.m., Quaglin emerged from the crowd and again charged towards the police line. Quaglin approached USCP Sergeant Troy Robinson, who stood inches away from a set of marble stairs, and Quaglin aggressively pointed his finger inches away from the sergeant's face.



*Images 19-20: Screenshots of Capitol Police Surveillance footage, right, and third-party footage, left, showing Quaglin (yellow square) pointing at and around a police officer moments before Quaglin attacked the officer*

Suddenly, Quaglin grabbed Sergeant Robinson by the neck and tackled him to the ground. *See* Ex. 15 at 4:57-5:29; Ex. 18 at :00-:30; Ex. 19 at :17-:51. As a result of Quaglin's attack, Sergeant Robinson fell backwards onto the staircase, suffering serious bodily injury.[5] Ex. 18.1.

---

[5] The government intends to submit additional information regarding this serious bodily injury through Sergeant Robinson's Victim Impact Statement.



*Images 21-22: Screenshots of Capitol Police Surveillance footage showing Quaglin (yellow square) grabbing, left, and then choking, right, an officer to the ground (Ex 316 at 5:08; Ex. 18 at :12)*

Quaglin's attack ignited a short brawl. With Quaglin on top of Sergeant Robinson, other rioters came to Quaglin's assistance and chaos broke loose. Other rioters attacked officers and threw objects at the police line. Ex. 14 at 1:11:30-:1:12:00 p.m. After officers pulled Quaglin off Sergeant Robinson, Quaglin regained his footing, stepped back from the police line, and continued yelling and waving at the officers.

Not more than ten seconds later, Quaglin initiated a confrontation with another officer. Ex. 19 at 1:00-1:10; Ex. 14 at 1:12:00-1:12:10 p.m. For the next minute, Quaglin pushed several officers as they attempted to re-establish their line. Ex. 15 at :40-47.





*Images 23-25: Screenshots of Capitol Surveillance Footage, top, and third-party footage, bottom, showing Quaglin (yellow square) attacking police officers*

At about 1:12 p.m., as one officer bent down to pick an object from the ground, Quaglin hit the officer directly in the head with an unknown object that appears to be a gas mask. *See* Ex. 20 at 16:34; Ex. 15 at 5:45-6:01; Ex. 21 at 5:45.



*Images 26-27: Screenshots of open-source footage showing an officer bending over to pick up an object, left, and Quaglin hitting the officer in the head with the black object, right*

**Count Three (Assault of Deputy Chief Waldow) and related conduct:**   At about 1:12 p.m., Quaglin approached USCP Deputy Chief Waldow and swatted at him several times. Ex. 15 at 5:55-7:15. After Deputy Chief Waldow attempted to disengage, Quaglin escalated the interaction and forcefully shoved and hit Deputy Chief Waldow again. Ex. 19 at 1:10-2:20; Ex. 15 at 6:50-7:10.

 



*Images 28-30: Screenshots of Capitol Surveillance footage and open-source footage showing Quaglin (yellow square) attacking Deputy Chief Waldow (Ex 316 at 6:23-7:25; Ex. 21 at 1:11:50-1:12:55; Ex. 18.2)*

After attacking Deputy Chief Waldow, Quaglin approached another officer and, with outstretched arms, forcefully pushed that officer. *See* Ex. 15 at 6:55-7:20.



*Image 31: Screenshot of Capitol Surveillance footage showing Quaglin (yellow square) pushing an officer (Ex. 15 at 7:00)*

Around this same time, Metropolitan Police Department (MPD) officers had begun arriving on the West Front to assist the USCP officers. The officers erected a bike rack line on the West Front and attempted to move the crowd behind the bike racks. Quaglin physically resisted the officers' attempts to move him back into the crowd. In doing so, Quaglin reached forward and struck another officer.

At about 1:13 p.m., Quaglin forcefully pushed into several other police officers, grabbed onto one officer's arm, and hit one officer under his face mask.



18



*Images 32-35: Screenshots of body worn camera footage showing, clockwise, Quaglin pushing into a police officer, grabbing a police officer's arm, punching a police officer in the area where his body worn camera rests, and reaching his hand under a police officer's face mask (Ex. 22.1; Ex. 15.4; Ex. 22; Ex. 23)*

Police officers attempted to move Quaglin back towards the crowd, but he charged forward and pushed into at least two more officers.





*Images 36-38: Screenshots of Capitol Surveillance footage showing Quaglin charging towards police officers, top left, and pushing into an officer, top right, and a third-party photograph showing the same, bottom*

Two officers successfully escorted Quaglin back into the crowd behind the bike racks.



*Image 39: Screenshot of Capitol Surveillance footage showing officers escorting Quaglin into crowd*

Quaglin immediately started to pull on the newly erected bike rack barrier.



*Images 40-41: Photographs showing Quaglin (yellow square) with his hands pulling on the bike racks (see also Exs. 25, 25.1, 25.2)*

The officers held onto the bike racks and Quaglin was not immediately successful pulling the bike rack away from the officers. Officers repeatedly yelled at Quaglin and the crowd to "MOVE BACK!" but Quaglin ignored their commands. *See* Ex. 27 at 1:13:50-1:14:30 p.m.; Ex. 25 at 1:13:55-1:14:30 p.m.; Ex. 29 at 1:14:08-1:14:20 p.m.; Ex. 30.1. Quaglin then attacked the officers.



*Images 42-46: Screenshots of body worn camera footage and open-source footage showing*
*Quaglin attacking police officers*
*(Ex. 26.1; Ex. 26.2; Ex. 25.2; Ex. 27, Ex. 28)*

**Count Four (Robbery: theft of bike rack) and other conduct, including destruction of fences**:

Quaglin momentarily stepped back from the police line to adjust his helmet, Ex. 31 at :07, a rioter stepped forward and grabbed a metal bike rack barricade, *id.* at :07-:26. Quaglin reapproached the police line, swatted a police officer's hand, and grabbed that same bike rack. Ex. 31 at :32-:38. An officer sprayed Quaglin in the face with OC spray, but Quaglin's gas mask spared any affect. *See* Ex. 25 at 1:14:06 p.m. Quaglin and the other rioters aggressively yanked the bike rack from the police line, incidentally pulling the officers into the crowd. Quaglin reached forward with his fingers pointed at an officer's eyes, but another officer pushed Quaglin back. The rioters successfully gained control of the bike rack and passed it back into the crowd, creating a hole in the police line and providing the crowd another weapon to use against officers. Ex. 27 at 1:14:55-1:15:05 p.m.; Ex. 31 at :26-:57.





*Images 47-48: Photograph, top, showing Quaglin pulling bike rack from police officers and screenshot of body worn camera footage, bottom, showing Quaglin reaching towards an officer's eyes (Ex. 32; Ex. 33.1; Ex. 30.2; Ex. 30.3)*

Around 1:37 p.m., Quaglin continued yelling menacing and belligerent remarks at the officers, such as:

> You don't want this fight. You do not want this fucking fight. You are on the wrong fucking side. You're going to bring a fucking pistol, I'm going to bring a fucking cannon. You wait! You wait! You wait! Stay there like a fucking sheep! This guy doesn't know what the fuck is going on!

Ex. 34; Ex. 35; Ex. 21. Quaglin grabbed a metal bike rack and shook it. Ex. 34 at 2:50-3:00.

 

*Images 49-50: Screenshots of body worn camera footage showing Quaglin belligerently screaming at police officers (Ex. 34; Ex. 35.1)*

Quaglin remained on the West Front and continued his path of terror. After making his way back through the mob of rioters, he tore down two separate sections of black permanent fencing on the West Front.

 

*Images 51-52: Screenshots of video footage showing Quaglin (yellow square) tearing down permanent black fencing on the West Front (Ex. 36 at 6:10; Ex. 37 at 7:20-7:35; Ex. 525)*

**Count Eleven (Assault of Officer Foulds) and other conduct, including Quaglin's entry into the Lower West Terrace Tunnel:**

At about 2:34 p.m., Quaglin reapproached the officer line and forcibly pushed into MPD Officer Henry Foulds, Ex. 38, struck MPD Sergeant Mastony, Ex. 39, and grabbed the face mask of a third officer, Ex. 40.



*Images 53-56: Screenshots of body worn camera footage showing Quaglin (yellow square) attacking police officers*
*(Exs. 38 at 2:34:00-2:34:43, 38.1; Ex. 40 at 2:33:50-2:34:35 p.m.)*

After attacking the officers, Quaglin grabbed a police riot shield and passed it back into the crowd. Ex. 41 at 2:34.



*Image 57: Screenshot of body worn camera footage showing Quaglin (yellow square) stealing a police riot shield and passing it to the crowd behind him*

Eventually, after having been flanked and attacked for over an hour-and-a-half, the police line on the West Front of the Capitol completely broke and rioters surged forward. As officers retreated towards the Capitol building, the mob followed, trapping officers against a wall. Officers funneled into a narrow staircase built into the inaugural stage as they tried to escape from the mob. Quaglin closely followed the retreating officers.





*Images 58-59: Photograph showing police officers pressed against a wall (red rectangle) as they attempted to retreat from the rioters, top, and showing Quaglin (yellow square) at the front of the mob as he fought with police officers trapped between the mob and the wall, bottom*

As the officers waited to ascend the staircase, Quaglin continued attacking them.



*Images 60-63: Screenshots of body worn camera footage showing Quaglin attacking officers (Ex. 57.1; Exs. 39.1, 39.2; Ex. 410 at 12:00-12:30)*

Quaglin remained at the front of the mob, pushing, yelling at, and taunting police officers until the last of the officers escaped up the stairs. Exs. 41.3, 43.2; Ex. 44 at 12:00-12:30; Exs. 45.1, 45.2.



*Image 64: Photograph showing Quaglin (yellow rectangle) taunting police officers as they escaped up the stairway*

Amid chaos, Quaglin turned to face the crowd with his arms outstretched, and he reveled in his success.



*Image 65: Screenshot of open-source footage showing Quaglin (yellow rectangle) celebrating (Ex 504 at :23-:26)*

Quaglin ascended to the Lower West Terrace tunnel. At 3:03 p.m., Quaglin entered the tunnel. *See* Ex. 46 at 3:03:30 p.m. He quickly maneuvered to the front of the mob so that he was face-to-face with officers positioned at the end of the tunnel adjacent to the Capitol building. Ex. 47 at 3:03:30 p.m.; Ex. 48 at :36, 2:00-2:35. The rioters in the tunnel began to coordinate "heave ho" collective thrusts against the police officers. Ex. 49 at 13:28; Ex. 47 at 4:34. Quaglin joined. Police officers sprayed the mob with chemical irritants in an attempt to disperse the crowd but Quaglin, still wearing his gas mask, remained unaffected.

### Count Twenty (Robbery: theft of Officer Nguyen's riot shield) and related conduct:

As Quaglin approached the police line inside the tunnel at about 3:05 p.m., his co-defendant Robert Morss grabbed a police riot shield held by MPD Officer Phuson Nguyen. Quaglin aided Morss by also grabbing the shield. Together, Quaglin and Morss forcefully ripped the shield from the officer's hands. *See* Ex. 48 at 2:16; Exs. 47.2, 47.3; Ex. 50 at 3:05:20 p.m.. As they did so, a nearby rioter yelled "send the shield back, send the shield back!" Morss and Quaglin passed the shield to rioters behind them as Officer Nguyen fell to the ground – landing in a perilous position.



*Images 66-67: Screenshots of third-party footage showing Quaglin (yellow square) ripping the police shield away from Officer Nguyen, left, and the officer on the ground, right, after Quaglin ripped away the police shield (Ex. 48.1; Ex. 47.4)*

After disarming Officer Nguyen of his shield, Quaglin reapproached the police line and yelled epithets at the officers, including calling them "TRAITORS!"



*Images 68-69: Screenshots showing Quaglin (yellow rectangle) at the front of the mob in the tunnel (Ex. 50; Ex. 47.1)*

**Count Twenty-Three (spraying officers in the tunnel with chemical irritant), Count Thirty-Five (civil disorder), Count Thirty-Nine (disorderly and disruptive conduct with a deadly or dangerous weapon, chemical irritant), Count Forty-Seven (act of physical violence with deadly or dangerous weapon, chemical irritant):**

As the officers physically held the line against the coordinated thrusts of the mass of rioters, Quaglin attacked them again – this time with chemical irritant. Quaglin fired the irritant across the entire line of officers. When Officer Omar Forrester attempted to block the spray with a police shield, Quaglin maneuvered his arm around the shield and sprayed Officer Forrester directly in the face, impacting his ability to see, causing him to become disoriented, and inhibiting his ability to breathe. The spray at this time was particularly impactful because the crowd continued to forcefully push into the police line and Officer Forrester while he was debilitated.



*Image 70: Screenshot of open-source footage showing Quaglin (yellow square) spraying Officer Forrester in the face with chemical irritant*

**Count Twenty-Six (Assault against police line and aiding and abetting assault of Officer Hodges), Count Thirty-Five (civil disorder), Count Thirty-Nine (disorderly and disruptive conduct with a deadly or dangerous weapon, riot shield), Count Forty-Seven (act of physical violence with deadly or dangerous weapon, riot shield):**

While still at the front of the mob, Quaglin stole another police shield from officers and began shoving his entire body against the line of officers.

31



*Images 71-72: Screenshots of body worn camera footage showing Quaglin (yellow square) holding shield and pushing against police line (Ex. 50 at 3:07:51 p.m.; Ex. 50.1)*

Rioters around him yelled, "Hold the line, Patriots!" and "SHIELD WALL!" as Quaglin attacked. Quaglin continued pushing against the police line as another rioter approached the officers and sprayed the officers with chemical irritant. Ex. 51.1; Ex. 49 at 20:05.



*Images 73-74: Screenshots of footage showing Quaglin pushing into police line (Ex. 52.1; Ex. 53.1)*

As Quaglin continued to push into the police line, his co-defendant Steven McCaughey pinned MPD Officer Daniel Hodges between a metal door frame and a stolen police shield. McCaughey and the weight of the rioters behind him bashed into Officer Hodges as another co-defendant, Steven Cappuccio, violently attacked Officer Hodges while Cappuccio yelled, "How

do you like me now, motherfucker?" Ex. 49.1; Ex. 53 at :45. At the same time, Quaglin continued thrusting his body against the police officers at the front of the line, preventing the officers from protecting themselves or assisting Officer Hodges.

After Officer Hodges escaped, MPD Officer Michael Fanone repeatedly yelled at Quaglin and the rioters to "BACK IT UP!" and tried to reason with the crowd, stating: "Back it up! Come on buddy, we got injured officers." Quaglin ignored the commands and continued thrusting against the officers. Ex. 54 at 3:15:13 p.m.; Ex. 55 at 3:13:49; Ex. 53 at 3:20-3:30.

At about 3:18 p.m., the officers gained momentum and successfully pushed rioters, Quaglin included, out of the tunnel. At that time, one rioter wrapped his arm around Officer Fanone's neck and dragged him away from the police line and into the mob. One of the rioters shouted that the rioters should shoot Officer Fanone using his own gun.

Quaglin stood directly in front of Officer Fanone as he was dragged into the mob. Video footage recovered by the government does not fully depict the interaction between Quaglin and Officer Fanone, because other individuals obstruct the view. However, video footage shows that as Quaglin is directly in front of Officer Fanone (actions unclear), one individual, who appeared to be attempting to help Officer Fanone, grabbed Quaglin with two arms and threw Quaglin to the ground, away from Officer Fanone.





*Images 75-76: Screenshots of open-source footage showing Quaglin (yellow square) in front of Officer Fanone (red square), top, and an individual wrapping his arms around Quaglin before throwing Quaglin to the ground in an apparent attempt to help Officer Fanone, bottom*

Quaglin remained on Capitol grounds until after 4:00 p.m.

### *Quaglin's Post-Riot Videos, Posted on Social Media on January 6*

After the riot, Quaglin posted a video to social media that he recorded in a Washington, D.C. hotel. He stated,  "It was wild. The president didn't lie. It was fuckin' wild." Exhibit 2 at :12 - :20. "This is the first step. . . . I'm exhausted, I've been pepper sprayed. I've been pepper sprayed like twenty fucking times. I'm sure I'm going to make the news." Ex. 60 at 1:05-1:28.

Later that night, Quaglin met with other rioters. Quaglin recorded and posted on social media another video. Another individual said, "this is our city, we own this shit. Like the fucking Capitol is ours." Quaglin added, "we do own this shit!" Ex. 61 at :11-:17. In the video, Quaglin walked down a line of individuals as he exclaimed, "Patriots, Patriots, Patriots. Patriots down there, Patriots over here. . . . We're all alive, everyone in our group survived and we are good. When you guys see the footage, I was the guy in the red, white, and blue hoodie and the black helmet. . . . So I'm on a loop right now. I'm absolutely on a loop on Fox News. Black helmet and red, white, and blue. I got punched pretty good. I got - - whatever. It was what it is. It was a great time. I got bumps and bruises. And we're having a good time." Ex. 61 at :20–1:40.

### *Quaglin's Post-January 6 Statements*

Following January 6, Quaglin bragged about his participation in the riot. He told people, for example, that "[i]t was wild," Ex. 1 at 159, and "crazy," *id.* at 162, and he bragged that he "was in the middle of it," and sent photographs from the West Terrace, *id.* at 160; *id.* at 159. Quaglin also stated that he was there with people who "just wanted to make a statement that the right will not take it." *Id.* at 164. Quaglin consistently misrepresented his conduct. For example, he said, "We only pushed our way. I know I didn't hit any cops" and he falsely stated, "A guy died in my arm."

Even after his stipulated trial, Quaglin has publicly denounced his part in the riot and failed to take responsibility for his actions, repeatedly claiming that January 6 prosecutions are illegitimate and that he was coerced into taking a "plea." For example, Quaglin has publicly stated things like:

- "I just pled guilty to fourteen felonies that I didn't commit [and] the DOJ can suck my [unintelligible]."

- The country needs to get rid of the "tyrannical government," like the "weaponized DOJ and FBI" prosecuting January 6 defendants.

- At sentencing, he intends to "renege everything" and go to trial. And, if he is not given a new trial, he will go "off the hinges" at sentencing.

- He signed the "plea" under "duress."

In late January, Quaglin publicly spoke about the next time people would storm the Capitol and said he would "go out with a bang here!" Quaglin has continued to regularly appear on podcasts and social media airings, claiming his actions and the whole of January 6 was justified. And more recently, Quaglin has written a letter that's been circulated online, claiming that the events of January 6 got out of hand because of "FBI preplanning," and blaming his and other rioters' actions on local law enforcement. Quaglin continues to assert that his actions on that day were "justifiable," that the "march" on the Capitol was "long overdue," and that January 6 was a "warning."[6]

---

[6] *See https://persecutedpatriot.com/* (last visited May 17, 2024).

## III.    THE CHARGES AND CONVICTIONS AT STIPULATED TRIAL

On December 1, 2021, a federal grand jury returned the Fifth Superseding Indictment charging Quaglin and his eight co-defendants with a total of fifty-three counts. Quaglin was charged in fourteen counts:

1.    Count One, Assaulting, Resisting or Impeding Certain Officers, Aiding and Abetting, 18 U.S.C. §§ 111(a)(1), 2;

2.    Count Two, Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b);

3.    Count Three, Assaulting, Resisting or Impeding Certain Officers, Aiding and Abetting, 18 U.S.C. §§ 111(a)(1), 2;

4.    Count Four, Robbery, Aiding and Abetting, 18 U.S.C. §§ 2111, 2;

5.    Count Eleven, Assaulting, Resisting or Impeding Certain Officers, Aiding and Abetting, 18 U.S.C. §§ 111(a)(1), 2;

6.    Count Twenty, Robbery, Aiding and Abetting, 18 U.S.C. §§ 2111, 2;

7.    Count Twenty-Three, Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b);

8.    Count Twenty-Six, Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b);

9.    Count Thirty-Four, Obstruction of an Official Proceeding, Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2), 2;

10.   Count Thirty-Five, Interfering with Law Enforcement Officers During a Civil Disorder, Aiding and Abetting 18 U.S.C. §§ 231(a)(3), 2;

11.   Count Thirty-Nine, Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

12.   Count Forty-Seven, Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

13.   Count Fifty-Two, Disorderly Conduct in a Capitol Building, 40 U.S.C.
§ 5104(e)(2)(D); and

14.   Count Fifty-Three, Act of Physical Violence in a Capitol Building or Grounds, 40
U.S.C. § 5104(e)(2)(F).

On July 20, 2023, this Court convicted Quaglin of each of these offenses following a stipulated trial with agreed-upon facts.

## IV.   STATUTORY PENALTIES

Quaglin now faces sentencing on all fourteen counts. The Presentence Report issued by the U.S. Probation Office accurately identifies the statutory maximum sentences for each of the counts of conviction. PSR ¶¶ 184-92.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.   <u>Guidelines Analysis</u>

The government submits the following Guidelines analysis applies to Quaglin's conduct and convictions:

| | | |
|---|---|---|
| Count One: 18 U.S.C. § 111(a)(1) | | |
| U.S.S.G. § 2A2.2(a)[7] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |
| | | |
| Count Two: 18 U.S.C. § 111(a)(1) and (b) | | |
| U.S.S.G. § 2A2.2(a)[8] | Base Offense Level | 14 |

---

[7] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[8] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury[9] | +5 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under § 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
|  | **Total** | **27** |

**Count Three: 18 U.S.C. § 111(a)(1)**

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[10] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
|  | **Total** | **20** |

**Count Four: 18 U.S.C. § 2111**

|  |  |  |
|---|---|---|
| U.S.S.G. § 2B3.1(a) | Base Offense Level | 20 |
| U.S.S.G. § 3A1.2(a) | Official Victim | +3 |
|  | **Total** | **23** |

**Count Eleven: 18 U.S.C. § 111(a)(1)**

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[11] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
|  | **Total** | **20** |

**Count Twenty: 18 U.S.C. § 2111**

|  |  |  |
|---|---|---|
| U.S.S.G. § 2B3.1(a) | Base Offense Level | 20 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +3 |
|  | **Total** | **23** |

**Count Twenty-Three: 18 U.S.C. § 111(a)(1) and (b)**

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[12] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |

---

directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[9] The Serious Bodily Injury here refers to the injuries suffered by Sergeant Robinson.

[10] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[11] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[12] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury[13] | +5 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under § 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | <u>+6</u> |
|  | **Total** | **31** |

Count Twenty-Six: 18 U.S.C. § 111(a)(1) and (b)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[14] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under § 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | <u>+6</u> |
|  | **Total** | **26** |

Count Thirty-Four: 18 U.S.C. § 1512(c)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2 (c) | Official Victim | <u>+6</u> |
|  | **Total** | **20** |

Count Thirty-Five: 18 U.S.C. § 231(a)(3)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[15] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(D) | Serious Bodily Injury | +5 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | <u>+6</u> |
|  | **Total** | **29** |

Count Thirty-Nine: 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[16] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(D) | Serious Bodily Injury | <u>+5</u> |
|  | **Total** | **23** |

Count Forty-Seven: 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A)

---

[13] The Serious Bodily Injury here refers to the injury suffered by Officer Forrester.

[14] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[15] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[16] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

| U.S.S.G. § 2A2.2(a) [17] | Base Offense Level | | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | | +4 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | | +6 |
| | | **Total** | **24** |

Counts Fifty-Two and Fifty-Three are Class B misdemeanors. As such, the U.S. Sentencing Guidelines do not apply to these counts of conviction.

### B.   <u>Grouping Analysis</u>

The offenses charged in Counts 34 and 39 constitute a single group because the victim is the U.S. Congress. *See* U.S.S.G. § 3D1.2(a) and (b).

Counts 1, 2, 3, 11, 23, and 26, all charging assault, each involve separate victims and therefore are not grouped under U.S.S.G. § 3D1.2(a) and (b).

The assaults with dangerous weapons in Counts 23 and 26 "embod[y] conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" the Count 47 offense of violating 18 U.S.C. § 1752(a)(4), specifically, the +4 enhancement for a dangerous weapon, pursuant to U.S.S.G. § 2A2.2(b)(2). However, as noted, when there are "several counts, each of which could be treated as an aggravating factor to another more serious count," "the guideline for the more serious count provides an adjustment for only one occurrence of that factor," and "[i]n such cases, only the count representing the most serious of those factors is to be grouped with the other count." U.S.S.G. § 3D1.2, cmt. n.5.   Here, the assault count with the highest offense level is Count 23. Hence, Count 23 also groups with Count 47. Under note 5, the other assault count – Count 26 – would comprise a separate group.

---

[17] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

The assaults with dangerous weapons in Counts 23 and 26 also "embod[y] conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" the Count 35 offense of violating 18 U.S.C. § 231(a)(3), specifically, the +4 enhancement for a dangerous weapon, pursuant to U.S.S.G. § 2A2.2(b)(2). However, as noted, when there are "several counts, each of which could be treated as an aggravating factor to another more serious count," "the guideline for the more serious count provides an adjustment for only one occurrence of that factor," and "[i]n such cases, only the count representing the most serious of those factors is to be grouped with the other count." U.S.S.G. § 3D1.2, cmt. n.5. Here, the assault count with the highest offense level is Count 23. Hence, Count 23 also groups with Count 35. Under note 5, the other assault count – Count 26 – would comprise a separate group.

The robbery convictions – Counts 4 and 20 – involve different victims from Counts 1, 2, 3, 11, 23, 26, 34, 35, 39, and 47, and from each other, and thus constitute separate groups. U.S.S.G. § 3D1.2(a).

Therefore, counts are grouped in the following manner:

<u>Group One</u>
Count 23 – 18 U.S.C. § 111(a)(1) and (b)     (Officer Forrester)          (OL: 31)
Count 35 – 18 U.S.C. § 231(a)(1)             (Officers)                  (OL:29)
Count 47 – 18 U.S.C. § 1752(a)(4), (b)(1)(A) (Officer Forrester; Line of
                                             MPD Officers)               (OL: 24)
<u>Group Two</u>
Count 1 – 18 U.S.C. § 111(a)(1)              (Officers on West Front)    (OL:20)

<u>Group Three</u>
Count 3 – 18 U.S.C. § 111(a)(1)              (Deputy Chief Waldow)       (OL: 20)

<u>Group Four</u>
Count 11 – 18 U.S.C. § 111(a)(1)             (Officer Foulds, Sergeant
                                             Mastony, MPD Officer)       (OL: 20)

42

Group Five
Count 2 – 18 U.S.C. § 111(a)(1) and (b)          (Sergeant Robinson)          (OL: 27)

Group Six
Count 26 – 18 U.S.C. § 111(a)(1) and (b)          (Line of MPD Officers)          (OL: 26)

Group Seven
Count 4 – 18 U.S.C. § 2111          (MPD Officers)          (OL: 23)

Group Eight
Count 20 – 18 U.S.C. § 2111          (Detective Nguyen)          (OL: 23)

Group Nine
Count 34 – 18 U.S.C. § 1512(c)(2)[18]          (Congress)          (OL: 20)
Count 39 – 18 U.S.C. § 1752(a)(2), (b)(1)(A)          (Congress)          (OL: 23)

## C.    Multiple Count Adjustment

Units are assigned pursuant to U.S.S.G. § 3D1.4(a), (b) and (c). One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally as serious or from 1 to 4 levels less serious. One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level. Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

| Count | Adjusted Offense Level | Units |
|-------|------------------------|-------|
| Group 1 | 31 | 1 |
| Group 2 | 20 | 0 |
| Group 3 | 20 | 0 |
| Group 4 | 20 | 0 |
| Group 5 | 27 | 1 |
| Group 6 | 26 | ½ |

---

[18] In light of the United States Court of Appeals for the District of Columbia Circuit's opinion in *United States v. Brock*, No. 23-3045 (March 1, 2024), which held that "for purposes of Sentencing Guideline 2J1.2, the phrase 'administration of justice' does not encompass Congress's role in the electoral certification process," *id.* at 20, the government does not include the three-level enhancement under U.S.S.G. § 2J1.2(b)(2) for "substantial interference with the administration of justice" or the eight-point corollary under §2J1.2(b)(1)(B), in its calculation of the Sentencing Guidelines.

| | | |
|---|---|---|
| Group 7 | 23 | ½ |
| Group 8 | 23 | ½ |
| Group 9 | 23 | ½ |

**Total Number of Units:**                                              4

Greater of the Adjusted Offense Levels Above:          31

Increase in Offense Level: the offense level is
increased pursuant to the number of units
assigned by the amount indicated in the
table at U.S.S.G. § 3D1.4:                                         +4 levels

**Combined Adjusted Offense Level:**                      <u>**35**</u>


### D.      Acceptance of Responsibility

The Government agrees with the PSR that a 2-level reduction for acceptance of responsibility is not appropriate, pursuant to U.S.S.G. § 3E1.1(a). PSR ¶ 56. The defendant has not clearly demonstrated acceptance of responsibility for his offenses. Rather, as explained above, the defendant has repeatedly and publicly disavowed responsibility, stating things like: "I just pled guilty to fourteen felonies that I didn't commit [and] the DOJ can suck my [unintelligible]." Similarly, at a recent hearing, Quaglin unequivocally stated that he did not, and has not, ever cooperated with the government. Minute Order (3/27/2024) (Status Conference).

Moreover, an additional 1-level reduction is not appropriate under § 3E1.1(b). Section 3E1.1(b) is appropriate when the "defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." Here, Quaglin did not timely notify the government of his intention to sign a statement of facts in a stipulated trial, nor did he

permit the government to avoid preparing for trial. To the contrary, the government had fully prepared and arrived at the courtroom ready to proceed to trial before Quaglin announced his intent to sign a stipulated statement of facts. The government had already gathered hundreds of exhibits for trial against Quaglin, interviewed dozens of witnesses, prepared more than a dozen witnesses, prepared opening and closing remarks, completed pretrial briefings, and completed every other aspect of trial as it relates to Quaglin's case. *See* § 3E1.1 n.6 ("The timeliness of the defendant's acceptance of responsibility is a consideration under both subsections, and is context specific. . . . To qualify under subsection (b), the defendant must have notified authorities of his intention to enter a plea of guilty at a sufficiently early point in the process so that the government may avoid preparing for trial and the court may schedule its calendar efficiently.").

Nor did Quaglin's very delayed agreement to proceed by way of a stipulated trial permit the government to allocate its resources efficiently. Again, to the contrary, on the morning of trial when Quaglin was found guilty at the stipulated trial, the government had several witnesses waiting at the Courthouse and prepared to testify against Quaglin. Quaglin's last-minute agreement to stipulate to facts required the government to re-allocate resources towards last-minute logistical and strategic rearrangements of the trial (including re-arranging witnesses, exhibits, changing travel plans, and otherwise adjusting trial strategy and presentation), ultimately causing the government to expend more resources during the remainder of the trial of Quaglin's co-defendants. Accordingly, this is a paradigmatic case where a reduction under § 3E1.1(b) is wholly unwarranted.

E.     **U.S.S.G. § 4C1.1**

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline,

U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. There can be no question that § 4C1.1 does not apply in this case. Among almost unrelenting acts of violence against police for several hours, Quaglin committed six assaults of officers, three of which were committed with a deadly or dangerous weapon.

>F.      **Total**

>The U.S. Probation Office calculated Quaglin's criminal history as category I, which is not disputed. PSR ¶ 150. Accordingly, based on the government's calculation of Quaglin's total adjusted offense level at 35, Quaglin's Guidelines imprisonment range is 168 to 210 months of imprisonment.

## VI.     **SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

>In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

>A.      **Nature and Circumstances of the Offense**

>As shown in Section II(B) of this memorandum, Quaglin's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

>Quaglin, with full knowledge of the Congressional proceeding inside the Capitol and with intent to stop it, waged a relentless siege on police officers for several hours as he tried to gain access to the U.S. Capitol building to stop the certification of the electoral college vote. For weeks before traveling to Washington, D.C., Quaglin spoke of the weapons that he intended to bring and

repeatedly stated his belief that the country was heading into "WAR!" Quaglin announced his intent to participate in the "war" and keep the former president in power at all costs. Quaglin followed through with his plans. Quaglin was not only convicted of six separate physical assaults against officers (including two committed with a deadly or dangerous weapon and one that resulted in serious bodily injury), but he also physically struck or pushed another dozen officers during his tirade on the West Front. While on the West Front, Quaglin also tore down permanent metal fencing to aid the mob. And shortly after the mob flooded the West Front, Quaglin brazenly stepped forward and was one of the first rioters to physically attack the police line—and he did so repeatedly. Quaglin berated officers, yelling menacing comments to accompany his physical attacks. Even after the police line broke and officers retreated from the mob, Quaglin followed closely behind, ensuring that the attack against the officers continued. And he used weapons against the officers, including stolen police shields, metal bike racks, and chemical irritant. Quaglin was part of some of the most gruesome attacks in the tunnel as he worked with other rioters to ensure that officers were under constant attack. The protracted, violent nature and circumstances of Quaglin's behavior are of the utmost seriousness and fully support the government's recommended sentence of 168 months of incarceration.

### B.      Quaglin's History and Characteristics

Quaglin is a 38-year-old electrician from New Jersey. PSR ¶ 172. He was raised in a stable middle class family and has suffered no major physical or psychological trauma that would have contributed to his spasm of violence on January 6. PSR ¶¶ 157-59. He was earning $40 an hour as a foreman when he committed the instant crimes. PSR ¶ 174.

Quaglin is married and has one child, and his wife is employed as a nurse. The presentence

report does not state that his wife, who is contemplating seeking a divorce from Quaglin because of the instant crimes, PSR ¶ 160, has been unable to support herself or her son while Quaglin has been incarcerated in this case. Quaglin has some criminal history charges, including use or possession with intent to use drugs and simple assault, PSR ¶ 152-153, and he was convicted of driving under the influence, PSR ¶ 149.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Quaglin's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[19] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence for Quaglin weighs heavily in favor of a lengthy term of incarceration. Quaglin has not expressed one iota of remorse or contrition for his crimes. His social media statements after January 6 were those of a man girding

---

[19] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

for another battle. And his frequent statements on various shows and podcasts since he has been charged and detained have consistently denied his conduct on January 6, blamed others – including police officers – and characterized himself as a political prisoner. Quaglin has shown no appreciation of the gravity of his conduct, the impact that his conduct had on the more than dozen police officers that he assaulted, and the devastation that our country has suffered because of actions like his own. Moreover, Quaglin has also repeatedly slandered the officers who protected the Capitol on January 6 and criticized the prosecutions of January 6 defendants as purely "political."

Through its sentence, the Court must send an unambiguous message to Quaglin that his attempts to justify his crimes constitute a substantial aggravating factor that supports a lengthy prison sentence.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   <u>Unwarranted Sentencing Disparities</u>

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the

degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[20]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[21]

---

[20] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[21] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Quaglin was one of nine individuals charged in this case, each of whom committed crimes during the same approximate time in the Lower West Terrace tunnel. To aid the Court in sentencing Quaglin, and to address this § 3553(a) factor, the government provides the following table summarizing the sentences entered for each of Quaglin's co-defendants:

| Defendant | Gov. Guidelines Calculation | Gov. Recommendation | Court Guidelines Calculation | Sentence |
|---|---|---|---|---|
| Robert Morss | 97-121 months | 109 months | 57-71 months | 66 months |
| David Lee Judd | 87-108 months | 90 months | 37-46 months | 32 months |
| Geoffrey Sills | 97-121 months | 108 months | 57-71 months | 52 months |
| David Mehaffie | 57-71 months | 64 months | 6-12 months | 14 months |
| Tristan Stevens | 70-87 months | 78 months | 41-51 months | 60 months |
| Patrick McCaughey | 151-188 months | 188 months | 151-188 months | 90 months |
| Federico Klein | 108-135 months | 120 months | 51-63 months | 70 months |
| Steven Cappuccio | 97-121 months | 121 months | 97-121 months | 85 months |

Quaglin has been convicted of more and more serious assaults than any of his co-defendants (and he physically attacked far more officers than those charged assaults). Compared to his co-defendants, Quaglin participated in the fight against officers on Capitol grounds and in the tunnel collectively for the longest period. Quaglin's actions were taken with the clear purpose of stopping Congress from certifying the election results. Thus, a comparison with his co-defendants supports sentencing Quaglin to a longer sentence than his co-defendants.

No other January 6 defendant has been convicted of more assaults than Quaglin, so most other cases cannot compare to the sheer volume of violence Quaglin committed that day. Perhaps the closest comparator is Quaglin's co-defendant, Federico Klein, who was convicted of the same number of assaults – six – against police officers. However, even though this Court acknowledged at Klein's sentencing hearing that the Court had not seen a case where someone assaulted so many officers in so short of time, Quaglin's assaults are more aggravating and numerous than Klein's. First, whereas Klein was convicted of six assaults under 18 U.S.C. § 111(a)(1), Quaglin was convicted of six assaults but three were convictions under 18 U.S.C. § 111(b) for using a deadly or dangerous weapon and causing serious bodily injury. Quaglin's use of chemical irritant at a point-blank range in the tunnel and his choke-out of Officer Robinson who suffered serious bodily injury were far more violent than Klein's assaults.

Second, while Klein and Quaglin were each convicted of 18 U.S.C. § 1512(c)(2), and there was comparable evidence for both defendants regarding their intent and purpose in attempting to stop the certification, Quaglin was *also* convicted of two counts of robbery under 18 U.S.C. § 2111, whereas Klein was not. In both instances, Quaglin forcibly ripped critical defensive tools from police officer hands. In the first instance, Quaglin aided in ripping away a bike rack barrier, creating a vulnerability in the police line, which collapsed shortly after. In the second instance, Quaglin violently ripped a shield from an officer's hand, causing the officer to fall on the ground in the tunnel. The stolen shield would have undoubtedly aided the officer in defending himself against the rioters' attacks in the tunnel for hours to come.

Third, the aggravating nature of Quaglin's relevant conduct on the West Front far exceeded Klein's conduct. While Klein participated in one assault on the lower West Front against Officer

Harvey, Quaglin wreaked havoc for more than an hour on the West Front, assaulting at least a dozen officers as he made his way down the police line, ripping down permanent metal fences, and fighting to gain control of the metal bike racks.

And finally, Quaglin's social media postings demonstrate significant planning and preparation for January 6, including to bring weapons and to "storm" the Capitol. Even after January 6, Quaglin continued to make statements in support of the riot and disclaim any responsibility. Klein, on the other hand, did not speak publicly about his conduct or otherwise brag about his participation.

Therefore, although Klein's conduct and charges are comparable to Quaglin's, the aggravating factors in Quaglin's case dictate that a substantially longer sentence is warranted.

Quaglin's conduct was also more aggravating than his co-defendant Patrick McCaughey. As the Court knows, McCaughey was convicted following a bench trial of two counts of assault, including one count involving a deadly or dangerous weapon for his assault using a stolen police shield against Officer Hodges in the tunnel. Quaglin's conduct spanned for longer than McCaughey's conduct and, while McCaughey's assault against Officer Hodges was particularly heinous, Quaglin was convicted of *three* counts of 18 U.S.C. § 111(b), one of which led to serious bodily injury. Furthermore, Quaglin aided McCaughey's assault, as he was at the front of the mob pushing into the officers at the same time as McCaughey's assault against Officer Hodges. Moreover, Quaglin used deadly or dangerous weapons against officers during two other of his assaults, including chemical irritant spray, which he sprayed directly in the faces of police officers, and a shield, which he pushed into the police line as other rioters assaulted officers (including McCaughey). Additionally, while McCaughey's time in the tunnel was particularly violent,

Quaglin committed several assaults in the tunnel *but also* spent an hour-and-a-half harassing and physically assaulting more than a dozen officers on the West Front, whereas McCaughey's conduct was limited to his time in the tunnel. Additionally, while both defendants were convicted of obstruction of an official proceeding, Quaglin's intent to obstruct Congress was far more pronounced than McCaughey's. Quaglin planned specifically to "storm" the Capitol, he planned for violence, he brought weapons and gear, and he anticipated "WAR" following the announcement of the results of the presidential election. As explained above, Quaglin spent months prior to January 6 preparing supplies such as bear spray, body armor, full face shields, a hard-sided helmet, and weapons, and encouraging others to come so that the "militia" could storm the Capitol. Unlike Quaglin, McCaughey did not plan extensively, nor did he carry weapons to the Capitol. Finally, as explained above, Quaglin continued to disclaim responsibility for his conduct following January 6, whereas McCaughey did not make comparable statements. Thus, a substantially longer sentence is warranted for Quaglin.

Finally, in *United States v. Webster*, 21-cr-208 (APM), the court sentenced defendant Webster to 120 months of incarceration following a trial. On January 6, Webster came to Washington, D.C. wearing a bulletproof vest and carrying a firearm on his body and a flagpole in his hand. Once on Capitol grounds, Webster spent eight minutes elbowing his way to the front of the crowd. At the front, Webster approach a police officer, pointed at him, and yelled demeaning remarks. Webster put his hand on the bike rack in front of him and forcefully pushed against the bike rack twice. Webster then used his flagpole to bash it against the bike rack nearby the officer line; Webster swung the flagpole with such force that it broke the metal pole in half. When the police line started to retreat, Webster charged forward and tackled an officer to the ground and

attempted to rip off the officer's gas mask. The officer started to choke by the chinstrap of his helmet. This officer sustained several injuries as a result of Webster's attack. Webster made his way to the Lower West Terrace where he witnessed rioters drag Officer Fanone out of the tunnel.

Some of Quaglin's conduct was comparable to Webster's conduct, but Quaglin's overall participation in the riot was more aggravating. Both defendants charged forward and singularly attacked a police officer – Webster by tackling an officer and attempting to rip off his gas mask and Quaglin by grabbing Sergeant Robinson by the neck and choking him to the ground. Quaglin's attack led to more long-term injuries than the attack by Webster. Both defendants also put their hands on bike racks and pushed them against police officers, yelled and berated officers, and otherwise provoked violence. Quaglin provoked violence on many more occasions during his hour-and-a-half at the front of the mob on the West Front, compared to the relatively short time that Webster confronted officers. And, although Webster brought a firearm to the Capitol which in and of itself warranted a significant sentence, Quaglin came to the Capitol armed and prepared, with chemical irritant, a hard-sided helmet, a full-face gas mask, and a backpack. And both defendants failed to express regret or remorse for their conduct following January 6. However, Quaglin committed far more overall aggravating conduct than Webster, including that he (1) attacked more than a dozen officers more than Webster; (2) stole a metal bike rack and stole a police shield after forcibly ripping these items from police officers (in fact, he also stole and passed back a second police shield on the West Front); (3) entered the tunnel and joined the collective mob assault during some of the most violent attacks in the tunnel; (4) used deadly or dangerous weapons against police officers on two occasions, including spraying officers directly in the faces and using a stolen police shield against the police officers while other rioters sprayed those officers

with chemical irritants; (5) planned extensively for January 6, encouraging others to come and preparing for "war"; and (6) participated in some manner in the attack against Officer Fanone, both as a participant in the tunnel as Officer Fanone was being dragged out and immediately after Officer Fanone had been pulled into the crowd. Therefore, a longer sentence is warranted for Quaglin.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Quaglin was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[22]

Because Quaglin in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Quaglin responsible for his individual contribution to the victims' total losses. *See Paroline*

---

[22] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

*v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Quaglin to pay $2,000 in restitution for his convictions on Counts 1, 2, 3, 4, 11, 20, 23, 26, 34, 35, 39, 47, 52, and 53. This amount fairly reflects Quaglin's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  FINE

Quaglin's convictions under Sections 111, 1512, 231, 2111, and 1752 subject him to a statutory maximum fine of $250,000. PSR ¶ 219. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a

defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the revised PSR notes, Quaglin has raised over $82,000 in an online campaign styled as a "Justice for Chis Quaglin." PSR ¶ 182. Quaglin "advertises" his fundraising page publicly when discussing his case and as he asks the public to donate to his cause, which includes denouncing responsibility for his crimes and placing blame on others, including law enforcement. Recently, Quaglin removed his online campaign account, but has since opened a new account, called "The Persecuted Patriot Chris Quaglin," which seeks donations from "those who continue to support the cause of Patriots worldwide fighting oppressive and overly aggressive governments." The new account has raised, to date, $860. Quaglin should not be able to "capitalize" on his participation in the Capitol breach in this way.   **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 168 months of incarceration, three years of supervised release, $2,000 in restitution, a fine in the amount $82,000, and a $1,220 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/ Ashley Akers*
ASHLEY AKERS
MO Bar #69601
Trial Attorney
United States Attorney's Office
601 D Street, N.W.
Washington, DC 20530
Phone: (202) 353-0521
Email: Ashley.Akers@usdoj.gov